740 F.2d 1190
 239 U.S.App.D.C. 87
 NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Citizens Committee for Broadcasting, et al.,
Western Union Telegraph Company, Forward Communications
Corporation, et al., Graphic Scanning Corporation, United
States Satellite Broadcasting Company, Inc., Direct
Broadcast Satellite Corporation, Satellite Television
Corporation, Satellite Syndicated Systems, Inc., Aerospace
and Flight Test Coordinating Council, Manufacturers Radio
Frequency Advisory Committee, CBS, Inc., National Black
Media Coalition, Association of Maximum Service Telecasters,
Inc., California Public Safety Radio Association, Inc., RCA
American Communications, Inc., Intervenors.
NATIONAL ASSOCIATION OF BROADCASTERS, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Appellees,
Satellite Television Corporation, National Citizens
Committee for Broadcasting, et al., Satellite Syndicated
Systems, Inc., Forward Communications Corporation, U.S.
Satellite Broadcasting Co., et al., Televisa, S.A., National
Black Media Coalition, CBS, Inc., Intervenors.
COUNTY OF LOS ANGELES, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Satellite Television Corporation, Intervenor.
 Nos. 82-1926, 82-2233 and 83-1743.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 23, 1984.
Decided July 24, 1984.
 
 Petitions for Review of an Order of the Federal Communications commission.
 Appeal from an Order of the Federal Communications Commission.
 Eugene F. Mullin, Washington, D.C., with whom Erwin G. Krasnow, Valerie G. Shulte, Nathaniel F. Emmons and Robert D. Rosenberg, Washington, D.C., were on the brief for National Association of Broadcasters, petitioner/appellant in Nos. 82-1926 and 82-2233.
 Joseph P. Markoski, Washington, D.C., with whom Philip L. O'Neill, Washington, D.C., and Mary F. Wawro, Los Angeles, Cal., were on the brief for County of Los Angeles, petitioner in No. 83-1743.
 Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, and Gregory M. Christopher, Counsel, F.C.C., Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents/appellees in Nos. 82-1926, 82-2233 and 83-1743. Margaret G. Halpern and Marjorie S. Reed, Attys., Dept. of Justice, also entered appearences for respondents/appellees.
 Lawrence W. Secrest, III, Washington, D.C., with whom John S. Hannon, Jr., Keith Fagan, Alan B. Sternstein, Richard E. Wiley and Philip V. Permut, Washington, D.C., were on the brief for Satellite Television Corporation, intervenor in Nos. 82-1926, 82-2233 and 83-1743. Warren Y. Zeger, Cynthia L. Hathaway, Yvonne S. Distenfeld and Patricia M. Reilly, Washington, D.C., also entered appearances for intervenor, Satellite Television Corporation.
 Wilhelmina Reuben Cooke, Washington, D.C., was on the brief for National Citizens Committee for Broadcasting, et al., intervenors in Nos. 82-1926 and 82-2233.
 Marvin Rosenberg, James G. Ennis and Thomas Dougherty, Jr., Washington, D.C., were on the brief for U.S. Satellite Broadcasting Company, Inc., intervenor in Nos. 82-1926 and 82-2233.
 Jonathan D. Blake and Gregory M. Schmidt, Washington, D.C., were on the brief for Association of Maximum Service Telecasters, Inc., intervenor in No. 82-1926.
 James A. McKenna, Jr., Thomas N. Frohock and Dennis P. Corbett, Washington, D.C., were on the brief for Forward Communications Corporation, et al., intervenors in Nos. 82-1926 and 82-2233.
 Norman P. Leventhal and Barbara K. Kline, Washington, D.C., were on the brief for Televisa, S.A., intervenor in No. 82-2233.
 John D. Lane, Martin J. Gaynes and Ramsey L. Woodworth, Washington, D.C., were on the brief for California Public Safety Radio Association, Inc., intervenor in No. 82-1926.
 George Robert Johnson, Jr. was on the brief for National Black Media Coalition, Arlington, Va., intervenor in Nos. 82-1926 and 82-2233.
 Joseph M. Kittner, Lawrence J. Movshin and Randolph J. May, Washington, D.C., were on the brief for Manufacturers Radio Frequency Advisory Committee, intervenor in No. 82-1926.
 Ronald D. Coleman and Lisa B. Margolis, Washington, D.C., were on the brief for Direct Broadcast Satellite Corporation, intervenor in No. 82-1926.
 Allan C. Hubbard, Washington, D.C., entered an appearance for Western Union Telegraph Company, intervenor in No. 82-1926.
 George Vradenburg, III, Paul B. Jones, New York City, and Joseph DeFranco, Washington, D.C., entered appearances for CBS, Inc., intervenor in Nos. 82-1926 and 82-2233.
 Robert F. Corazzini and Peter H. Feinberg, Washington, D.C., for Satellite Syndicated Systems, Inc., intervenor in Nos. 82-1926 and 82-2233.
 Henry A. Solomon and Joel Rothstein Wolfson, Washington, D.C., entered appearances for Graphic Scanning Corporation, intervenor in No. 82-1926.
 Jay E. Ricks, David J. Saylor, Peter A. Rohrbach, Washington, D.C., and Carl J. Cangelosi, Piscataway, N.J., entered appearances for RCA American Communications, Inc., intervenor in No. 82-1926.
 Before TAMM, MIKVA and DAVIS*, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 Of the technological innovations currently revolutionizing the communications field, the most recent, and potentially the most significant, is direct broadcast satellite service (DBS). DBS involves the transmission of signals from the earth to highpowered, geostationary satellites which then beam television signals directly to individual homes equipped to receive them. Use of satellites massively extends the range of a broadcaster's voice by freeing it from the atmospheric limitations that traditionally limit terrestrial broadcasters to narrow broadcast areas; a single DBS signal will eventually be capable of reaching the entire continental United States. For this reason and others, DBS promises several significant advantages over existing television technology: high-quality service to individuals in rural or remote areas where conventional broadcasting is inefficient; the addition of many more channels even in urban areas already receiving several television signals; "narrowcasting" of programs to specialized tastes through the ability to aggregate small, widely dispersed audiences; the development of higher quality visual and audio signals through use of high-definition-television signals; and television transmission of non-entertainment programming, such as medical data and educational information.
 
 
 2
 The regulatory approach to DBS taken by the Federal Communications Commission (the FCC or the Commission), which we review today, is as novel as the technology with which it is concerned. In essence, the Commission has chosen to deregulate DBS even before the service is born. Two proceedings are before us today that embody that approach: the Commission's Interim DBS regulations, which delineate the basic contours of the regulatory environment that DBS owners and operators will face when DBS becomes operational, and the approval of an actual application to construct this country's first multi-channel DBS system. We find that, on the whole, the FCC has done a commendable job in assuring that regulation in the communications field not impede new technologies that offer substantial public benefits, and we therefore uphold the major portion of the interim DBS regulations and approve in its entirety the FCC's grant of the application to construct an actual DBS system. We also find, however, that in its zeal to promote this new technology, the FCC gave short shrift to certain of its statutory obligations, and we therefore vacate part of the Interim DBS regulations; in addition, our approval of other parts is qualified by several guidelines to which the Commission must hew in its continuing oversight of this nascent technology.
 
 BACKGROUND
 
 3
 In the early 1960s, the development of satellites that could transmit signals over great distances offered new promise of expanding the availability of communications services throughout the United States. To develop this satellite technology, Congress created the Communications Satellite Corporation (COMSAT), a privately run, government-subsidized company which was to provide international communications links via satellite. See Communications Satellite Act of 1962, now codified at 47 U.S.C. Secs. 701-44. Because early communications satellites emitted relatively weak signals that could be received by only large and expensive "dish" antennas and radio receivers, these satellites were not suited to deliver broadcast signals directly to a large number of individual homes. To be practical, broadcasting directly to viewers' residences requires very small and inexpensive antennas and receivers which, in turn, require high-powered satellites. In August 1979, however, COMSAT announced its belief that satellite and receiver technology had advanced to the point that a commercial DBS system was feasible.
 
 
 4
 Even before this announcement, the development of DBS had received considerable regulatory attention both internationally and in the United States. Unlike conventional broadcasting, which generally has no extraterritorial effects, DBS requires international supervision both because the signals sent to and from a DBS satellite will spill across international borders and because agreement is needed to fix the orbital locations in space at which various countries' DBS satellites will be located. Much of the early regulatory attention focused on what part of the spectrum to assign for transmission of DBS signals. Domestically, the FCC in 1973 indicated that some spectrum space in the 11.7-12.2 GHz band might eventually be set aside for DBS systems. Frequency Allocations--Satellite Services, 28 Rad.Reg.2d (P & F) 33 (1973). In the course of preparing for the 1979 World Administrative Radio Conference (WARC-79), the Commission then decided to seek international agreement to shift the international allocation of DBS to the 12 GHz band in order to accommodate future U.S. DBS requirements. World Administrative Radio Conference, 70 F.C.C.2d 1193, 1252 (1978). WARC-79 did allocate for international purposes the 12 GHz band to DBS; WARC-79, however, postponed assignment of specific DBS orbital locations and frequencies among Western Hemisphere countries pending completion in 1983 of a Regional Administrative Radio Conference (RARC-83).
 
 
 5
 Soon after WARC-79 concluded, the Commission began to consider how to protect and advance U.S. interests in DBS use of the 12 GHz band. On October 29, 1980, the FCC initiated a domestic proceeding to consider the prospects for United States DBS service. 45 Fed.Reg. 72719 (1980) (1980 Notice ). The 1980 Notice noted the rapid advances being made in DBS technology and observed that DBS was a new medium with which the Commission had no practical experience. The FCC therefore specifically sought comments on whether it should adopt interim DBS regulations that would permit both the construction of experimental DBS systems prior to RARC-83 and the operation of DBS prior to the adoption of permanent domestic DBS rules. In addition, the Commission solicited comments on the feasibility of different sharing arrangements between DBS and existing terrestrial systems occupying the 12.2-12.7 GHz band, the amount of spectrum that should be allocated to each of these two mutually exclusive services, and the costs involved and lead time required if terrestrial users had to move to frequency bands other than 12 GHz.
 
 
 6
 During the course of proceedings under the 1980 Notice, Satellite Television Corporation (STC), a subsidiary of COMSAT and an intervenor in the present action, filed an application to construct this country's first multi-channel DBS system. STC urged the FCC to consider the application in a separate and expedited adjudicatory proceeding, rather than wait until rulemaking had been completed and formal DBS regulations promulgated. The Commission declined to process STC's application in this fashion and instead placed the application in the DBS docket so that the question of authorizing DBS prior to RARC-83 could be considered in the context of a specific DBS application. The FCC then provided additional time for interested parties to comment on DBS and on the STC application.
 
 
 7
 In June 1981, after six months of reviewing comments filed during the original and extended comment periods, the Commission released a Notice of Proposed Policy Statement and Rulemaking. 86 F.C.C.2d 719 (1981) (DBS Notice ). In the DBS Notice, the Commission formally proposed to establish interim DBS regulations prior to RARC-83 and explained that the Commission was unwilling to propose permanent DBS regulations at that time because it did not yet know what international constraints RARC-83 would impose on domestic DBS. Nonetheless, according to the Commission, interim DBS rules were warranted to avoid "unnecessary delays" and to gain information that would aid in setting permanent regulatory policies. 86 F.C.C.2d at 721. To this end, the proposed interim regulations were designed to assure "maximum flexibility"--and to impose minimum regulation--during the interim period.
 
 
 8
 On July 14, 1982, the Commission in fact adopted interim DBS regulations (DBS Order ). 90 F.C.C.2d 676 (1982). The Commission stated that immediate authorization of DBS service would significantly accelerate realization of the benefits associated with the technology and would strengthen this country's international position at RARC-83 by permitting the United States negotiators to "present immediate and demonstrable needs rather than vague conjectures as to possible requirements" for orbital slots and frequencies. Id. at 684. Subsequently, the Commission, on October 13, 1982, granted STC's application to construct an experimental DBS system that would provide subscription television service to the general public. STC Decision, 91 F.C.C.2d 953 (1982). Although STC's proposal called for service eventually covering the entire continental United States, the STC Decision granted STC construction authority for only the first phase of its proposed system, which involves two satellites designed to provide three channels of subscription television service over the eastern portion of the United States. (STC has subsequently asked the Commission for authority to provide six, rather than, three, channels of service, but the Commission has not yet acted on this request.) The grant was also conditioned upon the outcome of RARC-83 and included neither launch and operational authority nor assignment of specific frequencies and orbital locations for STC's DBS system.
 
 
 9
 In this action, petitioners the National Association of Broadcasters (NAB) and the County of Los Angeles (the County) seek to overturn the interim DBS orders and the grant of STC's DBS application. A congery of intervenors also has filed briefs on both sides of the important issues at the forefront of modern communications policy raised by these cases. We now turn to those issues.
 
 ANALYSIS
 
 10
 I. The FCC's Power to Approve Non-Local Broadcast Service
 
 
 11
 DBS technology is inherently unsuitable for the provision of traditional local broadcast service. The satellites involved cannot presently be located with the requisite precision nor economically equipped with a sufficiently large antenna to provide a spot beam capable of covering only a traditional size local community. STC Application Volume 1, at 55 n. 100; JA 693 n. 100. Moreover, many of the benefits of DBS--including narrowcasting and provision of service to less densely populated areas--could not practically be realized by a "local" DBS system. As a result, DBS, as authorized by the FCC, will provide regional or national service. The STC Decision, for example, authorizes transmission service to the entire Eastern coast of the United States.
 
 
 12
 Petitioner NAB argues that the FCC does not have the power to approve a technology that will sever broadcast services from their traditional link to a particular community. NAB seeks to rest this luddite argument on section 307(b) of the Communications Act of 1934, as amended, 47 U.S.C. Sec. 307(b) (the Act), which provides:
 
 
 13
 the Commission shall make such distribution of licenses ... among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same.
 
 
 14
 47 U.S.C. Sec. 307(b) (emphasis added). NAB reads this provision to require that broadcast licenses indeed be "distributed" among the "States" and "communities;" NAB thus concludes that the Act mandates a system of local broadcast licensing and service with which STC's authorization, and DBS in general, is "fundamentally irreconcilable."
 
 
 15
 We do not think it necessary to ascribe to the framers of the Act an intent so shortsighted as to preclude new technology that offers the promise of substantial public benefit. The plain language of the Act does not compel such impracticable consequences. Cf. United States v. Missouri Pacific Railroad Co., 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929) quoted infra at 1202. Instead, the Act emphasizes that the FCC's paramount responsibility is to achieve a "fair, efficient and equitable distribution of radio service ... so as to make available, as far as possible, to all the people of the United States a rapid, efficient, nation-wide, and world-wide wire and communications service," 47 U.S.C. Sec. 151. The ultimate touchstone for the FCC is thus the distribution of service, rather than of licenses or of stations; the constituency to be served is people, not municipalities. Moreover, the Commission also has an obligation to "encourage the larger and more effective use of radio in the public interest." 47 U.S.C. Sec. 303(g). Given this obligation to facilitate expansion of this country's communications network and in light of the broad grant of authority delegated to the FCC to deal with "the rapidly fluctuating factors characteristic of the evolution of broadcasting," FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940), it would be anomalous to read the Act to prevent the FCC from authorizing an innovative system of technology capable of conferring substantial benefits on all Americans. See Wold Communications, Inc. v. FCC, 735 F.2d 1465 at 1475 (D.C.Cir.1984) ("The drafters of the Communications Act had no vision of a [satellite] industry, but they designed the statute 'to avoid the necessity of repetitive legislation,' by arming the Commission 'with sufficiently elastic powers such that it could readily accommodate dynamic new developments in the field of communications.' ") (quoted cases omitted). Just as we have held that the Act does not bestow a vested right on any particular licensee to retention of its license, see Victor Broadcasting, Inc. v. FCC, 722 F.2d 756 (D.C.Cir.1983), so too we now hold that the Act does not entrench any particular system of broadcasting: existing systems, like existing licensees, have no entitlement that permits them to deflect competitive pressure from innovative and effective technology.
 
 
 16
 In so holding we do not denigrate the importance of local programming to a national broadcasting system that is designed to serve the public interest. See Pasadena Broadcasting Co. v. FCC, 555 F.2d 1046, 1050-51 (D.C.Cir.1977). We need not define the outer limits of the Commission's authority to make this country's broadcasting system a regional or national one, however, for two reasons. First, the DBS Order does not by its terms eliminate local programming. Second, the Commission explicitly found that DBS will merely supplement the existing local broadcast system, rather than replace it, DBS Order, 90 F.C.C.2d at 691-92, and we find no error in that finding. We therefore need not decide how far the Commission may go toward the elimination of local programming to hold that not every communications service approved by the Commission need be tied to a local community.
 
 
 17
 It is true that the Commission historically has followed a policy of "localism" as a sound means of promoting the statutory goal of efficient public service. See Malrite T.V. v. FCC, 652 F.2d 1140, 1144 (2d Cir.1981). Although a regulated industry may come to regard an agency's policies as immutable elements in the background against which the industry is set, there is no need for the agency itself to confuse means with ends; when new technology permits the statutory objectives to be attained through novel means that require the alteration or abandonment of past Commission policies, the Commission may adjust its means to retail fidelity to the legislative end. See Washington Utilities & Transportation Commission v. FCC, 513 F.2d 1142, 1157 (9th Cir.), cert. denied, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975) ("Regulatory practices and policies that will serve the 'public interest' today may be quite different from those that were adequate to that purpose in 1910, 1927, or 1934, or that may further the public interest in the future."). Indeed, the Commission has long been criticized as acting primarily to preserve the status quo, thus discouraging innovative technology, see, e.g., E. KRASNOW & L. LONGLEY, THE POLITICS OF BROADCAST REGULATION 20 (1973); D. DELUC, CABLE TELEVISION AND THE FCC 28 (1973); when it instead seizes upon the "comprehensive powers to promote and realize the vast potentialities of radio" that Congress has conferred upon it, National Broadcasting Co. v. United States, 319 U.S. 190, 217, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943), the Commission is to be commended rather than castigated. This is not a case in which a regulatory agency is rushing willy nilly to remove past regulations in the face of a clear congressional mandate to the contrary; here the Commission instead has sought aggressively to fulfill the statutory objectives by acting to enhance the level of services available to the public.
 
 
 18
 We therefore find little need to tarry long on the argument of the local broadcasters that the statute immunizes them from DBS competition. Because DBS has the potential to yield broadcast services that significantly further the public interest, a finding of the Commission not truly disputed by any of the parties, the Commission acted well within its powers in approving the non-localized broadcasting characteristic of DBS.
 
 
 19
 II. Applicability to DBS of Broadcast Restrictions
 
 
 20
 The most innovative of the steps taken by the FCC with respect to DBS was the Commission's decision, in the service of a "flexible regulatory approach" designed to stimulate DBS technology, not to apply to DBS the major regulatory restrictions traditionally imposed on broadcasters. Central to this approach was the Commission's refusal to extend the broadcast restrictions of Title III of the Communications Act of 1934, as amended, to all DBS systems.
 
 
 21
 These statutory restrictions imposed upon broadcasters are among the most important elements of the compromise underlying passage of the 1927 Radio Act, the model for the Communications Act of 1934. As the Supreme Court has noted, when Congress decided that government regulation of the airways was needed to bring order to the chaotic and burgeoning broadcast industry, the crucial question was how to balance public and private control. Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 103-14, 93 S.Ct. 2080, 2086-92, 36 L.Ed.2d 772 (1973). Some congressmen argued that broadcasters should be treated as public utilities and thus have the obligation to act as common carriers by accepting all applicants for service on a nondiscriminatory basis. Such a pervasive access right was ultimately rejected, however, in favor of a more narrowly tailored approach in which broadcasters were required to fulfill certain well-defined public obligations. The essence of this compromise was the view that broadcasting should remain under private control in general but that certain uses of the airways, particularly political ones, were too central to democratic values to be left to the whim of the private broadcaster. Accordingly, the Radio Act imposed a specific set of restraints upon broadcasters that common carriers do not face and then, to cement the compromise, explicitly provided that a broadcaster should not be regulated as a common carrier. 47 U.S.C. Sec. 153(h).
 
 
 22
 Among the statutory restraints that broadcasters currently face are section 312(a)(7), which requires that qualified candidates for federal office be provided reasonable access to broadcast facilities, and section 315, which provides that, if one political candidate is allowed to use a station, other qualified candidates must be given an equal opportunity to respond. Because DBS is likely to be a particularly attractive medium at least for presidential candidates, the question of how these broadcast restraints apply to DBS is of great moment.
 
 
 23
 The DBS Order established the following classificatory scheme for purposes of applying the Act's broadcasting rules. Those DBS applicants which propose to provide service (whether in the form of free or pay-TV) direct to homes and to "retain[ ] control over the content of the transmissions" will be treated as broadcasters. A DBS satellite owner can choose instead to operate as a common carrier, in which case satellite transmission services would have to be offered indiscriminately to the public pursuant to tariff under the provisions of Title II of the Act; a satellite owner who chooses the common carrier option will not be treated as a broadcaster. Also not treated as a broadcaster under the DBS Order are those who lease satellite space from a DBS common carrier and who use the leased channels to distribute programming via satellite to individual homes. These lessees, who neither own nor operate a DBS satellite, are referred to as "customer-programmers" of DBS common carriers, and it is they who control the content of the programming transmitted by a DBS common carrier.
 
 
 24
 The FCC offered three rationales for the exemption of customer-programmers from Title III. First, at the time the Communications Act was passed, Congress, according to the FCC, envisioned a system that clearly distinguished broadcasters from common carriers; the possibility that a "broadcaster" might hook into a common carrier to allow the former to extend the range of its voice was simply not considered. Because Congress did not expressly consider what type of regulation would be appropriate for a system in which an entity that wished to send signals using facilities and frequencies licensed to a common carrier would provide service directly to the public, the FCC concluded that the Communications Act did not require one who leased satellite space from a common carrier to be licensed and regulated as a broadcaster. Second, imposition on a common carrier's programmer-customers of the limited access requirements now imposed on broadcasters was said to be duplicative of the more pervasive access obligations already imposed on the carrier itself. Third, in its regulations of the common carrier Multipoint Distribution Service (MDS), the technical details of which are discussed below, the Commission similarly had not required a carrier's programmer-customers, many of whom provide subscription programming services to individual residences, to be licensed or regulated as broadcasters, see Multipoint Distribution Service, 45 F.C.C.2d 616, 618-19 (1974). On the basis of these rationales, the Commission decided that it was free to determine where the public interest lay with regard to the regulatory regime imposed on DBS, and to conclude that "a flexible regulatory approach," in which customer-programmers would be unregulated for the present, would provide the Commission with experimental information that would better inform its eventual public interest judgments.
 
 
 25
 We recognize the Commission's authority to approve services on an experimental basis in an effort to gather important market data to be used in the completion of a regulatory framework. See, e.g., Network Project v. FCC, 511 F.2d 786 (D.C.Cir.1975). Moreover, as other parts of this opinion will confirm, that discretion is particularly capacious when the Commission is dealing with new technologies unforseen at the time the Communications Act was passed. But that discretion is not boundless: the Commission has no authority to experiment with its statutory obligations. We conclude that the Commission has engaged in precisely such forbidden statutory experimentation in exempting from Title III the customer-programmers of DBS common carriers.
 
 
 26
 We reach this conclusion by beginning not, as the Commission did, with the question whether Congress contemplated DBS in 1934, but rather with the language of the statute itself--the proper starting point for both agencies and courts as they struggle to sort out the complex and often elusive responsibilities that Congress has delegated to them. See International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979).
 
 
 27
 Section 3(o ) of the Communications Act defines "broadcasting" as "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." 47 U.S.C. Sec. 153(o ). we have previously held that the test for whether a particular activity constitutes broadcasting is whether there is "an intent for public distribution" and whether the programming is "of interest to the general ... audience." Functional Music, Inc. v. FCC, 274 F.2d 543, 548 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). Remarkably, the Commission did not even attempt to reconcile its approach with the statutory language or with our interpretation of that language in Functional Music. Nor do we believe the Commission could have done so successfully.
 
 
 28
 When DBS systems transmit signals directly to homes with the intent that those signals be received by the public, such transmissions rather clearly fit the definition of broadcasting; radio communications are being disseminated with the intent that they be received by the public. That remains true even if a common carrier satellite leases its channels to a customer-programmer who does not own any transmission facilities; in such an arrangement, someone--either the lessee or the satellite owner--is broadcasting. Despite the argument of some intervenors and the suggestion of the government in the companion case of United States Satellite Broadcasting Co. v. FCC,, 740 F.2d 1177 (D.C.Cir.1984), it also remains true regardless of whether a DBS system is advertiser or subscriber funded. The FCC at the time of the DBS decision was bound not to depart without reasoned explanation, see Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), from its conclusion in the subscription television proceedings several years ago that
 
 
 29
 [T]he primary touchstone of a broadcast service is the intent of the broadcaster to provide radio or television program service without discrimination to as many members of the general public as can be interested in the particular program as distinguished from a point-to-point message service to specified individuals .... broadcasting remains broadcasting even though a segment of the public is unable to view programs without special equipment ....
 
 
 30
 Further Notice in the Matter of Subscription Television Service, 3 F.C.C.2d 1, 9-10 (1966); see also Subscription Television Service Fourth Report and Order, 10 Rad.Reg. 2d (P & F) 1625, 1628, 1716-18 (1967); see generally National Association of Theatre Owners v. FCC, 420 F.2d 194 (D.C.Cir.1969) (affirming FCC's authority to approve subscription television service). While the FCC may be coming increasingly to the view that subscription services are not "broadcasting" see Satelitte Broadcasting Systems, FCC No. 83-403, released Nov. 3, 1983, a view not yet passed upon by the courts, the DBS Order must rise or fall upon the FCC's articulated policies at the time of the order. And as the Order itself recognizes, those policies did not distinguish free-TV from pay-TV for purposes of defining "broadcasting." 90 F.C.C.2d at 710. The FCC therefore cannot justify its exemption of some DBS systems from broadcast restrictions by pointing to the fact that those systems are subscriber rather than advertiser funded. See generally Committee for Community Access v. FCC,, 737 F.2d 74 at 77 (D.C.Cir.1984) ( ["T]he agency cannot silently depart from previous policies or ignore precedent.").
 
 
 31
 The irrationality of the Commission's view of the statute, which makes ownership the touchstone of broadcasting, is illustrated by the following example. If a DBS owner broadcasts programming directly to homes, it is subject to regulation as a broadcaster; if that owner sends its programs via leased channels on another satellite, the very same programming will be immune from broadcast regulation. Through a general system of cross-leasing, all DBS systems could therefore escape Title III. Nothing in the statutory definition allows the Commission to elevate form over function in this way nor suggests that the definition of broadcasting turns on whether the provider of the service leases satellite facilities from a common carrier or owns the satellite outright. When confronted with a problem unforseeable by the enacting Congress, it becomes especially important for agencies to bear in mind the admonition that, "[w]here the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." United States v. Missouri Pacific Railroad Co., 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929). Here it is the Commission's strained statutory construction that produces "absurd or impracticable" consequences; fidelity to the statutory terms themselves instead produces a coherent pattern of regulation.
 
 
 32
 Fidelity to the statute's plain language also best comports with the legislative history of the Communications Act. A central fear animating passage of the Radio Act of 1927, Pub.L. No. 69-632, 44 Stat. 1162, the predecessor of the Communications Act, was that one voice not dominate broadcast stations:
 
 
 33
 There is no agency so fraught with possibilities for service of good or evil to the American people as the radio ... it has limitless possibilities. The Power of the press will not be comparable to that of broadcasting stations when the industry is fully developed ... it will only be a few years before these broadcasting stations, if operated by chain stations, will simultaneously reach an audience of over half of our entire citizenship, and bring messages to the fireside of nearly every home in America. They can mold and crystallize sentiment as no agency in the past has been able to do. If the strong arm of the law does not prevent monopoly ownership and make discrimination by such stations illegal, American thought and American politics will be largely at the mercy of those who operate these stations.
 
 
 34
 67 Cong.Rec. 5557, 5558 (1926) (statement of Rep. Johnson) (emphasis added). How much more palpable these fears would have been had DBS existed in 1926 we can only speculate, but surely those fears would have been profound: DBS, with its power to reach into every home in the United States, has a potential impact on Americans far in excess of the limited radio services that prompted passage of the Radio and Communications Acts. This impact is only heightened by the Commission's interim decision to allow a DBS owner to retain control over the programming on several channels, an aspect of the DBS Order we discuss in the next section; STC, for example, will have control over three channels that will be beamed across the Eastern Seaboard and, eventually, the entire United States. In rural areas, the number of DBS channels may dwarf the number of terrestrial stations. And if a consumer chooses to buy reception equipment for only one DBS system, in rural areas that system may be virtually the only voice heard.
 
 
 35
 Very real practical consequences could therefore follow from the FCC's exemption of common carrier DBS lessees from broadcast restrictions--consequences at odds with the basic objectives of the Communications Act. Under the DBS Order, a federal candidate who wanted access to a DBS system that was operated as a common carrier could not force either the satellite owner or its channel lessees to provide that access, for both would be immune from the Act's broadcast restraints; the candidate would instead have to rely on his or her purchasing power, as well as on the whim of the channel programmer, to receive access and an opportunity to respond to opponents. It was to avoid this very result, in which a speaker "who could afford the cost" could purchase enough time on a broadcast station operated as a common carrier to dominate American thought and American politics without any regulatory restraints, that Congress imposed restraints such as the equal opportunity rule upon broadcasters. See Columbia Broadcasting System, Inc., v. Democratic National Committee, 412 U.S. 94, 130, 93 S.Ct. 2080, 2100, 36 L.Ed.2d 772 (1973).
 
 
 36
 We therefore reject the central rationale upon which the Commission relied to exempt customer-programmers of DBS common carriers from the statutory constraints under which broadcasters must operate: the fact that Congress did not in 1934 contemplate DBS does not give the Commission a blank check to regulate DBS in any way it deems fit. We have recognized previously that "[t]he limitations on Congress' ability to foresee or consider particular problems that may in the future arise under a statutory scheme often require that legislation be drafted by reference to general categories rather than to specific classes of activities within those categories." Natural Resources Defense Council, Inc. v. EPA, 725 F.2d 761, 770 (D.C.Cir.1984). As we said in that case, under such circumstances courts and agencies must "seek out the broader purposes--the overriding statutory goals--constitutive of the general categorical term in which Congress has embodied its will. Only by engaging in such purposive interpretation can we accord fidelity to Congress' objectives." Id. at 770. In this case, the plain meaning of the general categorical term "broadcasting" as well as the congressional goals that help give content to that term offer sufficient guidance of the way in which Congress would have wanted DBS to be regulated that the Commission was not free to chart its own independent course.
 
 
 37
 The Commission's other rationales for its treatment of customer-programmers provide even less persuasive reasons for the Commission's departure from the statute's plain language. The claim that imposition of Title III obligations on channel lessees "merely would serve to duplicate the more pervasive" common carrier obligations of Title II, 90 F.C.C.2d at 710, is clearly wrong, as Title II merely requires a carrier to accept all applicants for service on a non-discriminatory basis and thus offers no surrogate for Title III requirements such as reasonable access or equal opportunity. A common carrier cannot guarantee political candidates reasonable access to airtime or an equal opportunity to respond to opponents, for the sine qua non of a common carrier is the obligation to accept applicants on a non-content oriented basis. Nor does the Commission's Multipoint Distribution Service Decision, supra, convincingly support the treatment of DBS customer-programmers. An MDS system consists of a fixed station that transmits via microwaves various subscriber-supplied information to numerous fixed receivers, usually within a 25 mile range, equipped with directive antennas; generally, MDS is a one-way "private" television service that provides commercial and instutional subscribers with specialized communications in accordance with their specific transmission, reception, and programming requirements. 45 F.C.C.2d at 616; see also Midwest Corp., 53 F.C.C.2d 294 (1975). The Commission in its DBS Order apparently relied on the fact that MDS subscribers will not be treated as broadcasters. This reliance could be rejected merely by noting that the referenced MDS decision contains no discussion, let alone a reasoned one, of whether Title III applies to either the sender of the information or the transmitter of it; the Decision simply assumes that the transmitter will be treated as a common carrier and that the sender will be unregulated. But there are other reasons as well that the MDS analogy fails. First, at the time of the DBS Order, the information that MDS would transmit was thought to be subscriber supplied; the FCC did not contemplate that MDS would be used to offer subscription television for reception by the general public. See Multipoint Distribution Service, 34 F.C.C.2d 719 (1972) (The service was intended "to provide for relay of instructional and training television to schools, industry, municipal government, and for other miscellaneous uses such as the coverage of business, industry, or medical conventions."). Second, the Commission itself has concluded that MDS transmissions, which are received at specific locations and by directed antennas, are not "intended to be received by the general public," Midwest Corp., supra, 53 F.C.C.2d at 300; the Midwest Corp. decision thus views MDS, at least as it was conceived at the time of the MDS Decision, as more like the private radio service discussed in Functional Music, supra, 274 F.2d at 544, than like DBS. We hold that DBS, at least when directed at individual homes, is radiocommunication intended to be received by the general public--despite the fact that it can be received by only those with appropriate reception equipment. Moreover, while the FCC more recently has come to allow MDS to be used for subscription television, see 47 C.F.R. Sec. 21.903(b) (1982); Instructional Television Fixed Service, 54 Rad.Reg. 2d (P & F) 107 (1983), no court has yet passed on the validity of the Commission's exemption of MDS programmer-customers from broadcast regulation. The Commission's other articulated rationales for its treatment of DBS programmer-customers are thus as unconvincing as the Commission's attempt to create a gap in a statutory scheme in which the statutory language is plain.
 
 
 38
 A possible fourth rationale for the Commission's decision, one not articulated by the Commission itself, was supplied by the FCC's counsel in a post-argument letter to this court. Apparently relying on Section 301 of the Act, which provides that "[n]o person shall use or operate any apparatus for the transmission of" any radio signal without FCC approval, that letter suggests that customer-programmers are exempt from the broadcast restrictions because they lease, rather than own, satellite channels. Neither that rationale nor Section 301 is explicitly mentioned anywhere in the Commission's decision, and post-hoc rationalizations by counsel cannot fulfill the requirement for reasoned decisionmaking at the agency level. Burlington Truck Lines v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962). But even assuming the agency's decision sufficiently suggests the rationale offered by counsel, we nonetheless reject this rationale: customer-programmers who lease or otherwise receive access to DBS satellite channels sufficiently "use" those channels as to fall within the FCC's jurisdiction.
 
 
 39
 A final reason for exempting DBS customer-programmers from broadcast regulation, a reason not directly invoked by the FCC but raised by intervenors in the companion case, 740 F.2d 1177 et al. in an effort to bolster the Commission's DBS Order, must also be rejected. These intervenors argue that the Commission never regulates programmers but only station licensees; examples of non-regulated programmers are said to be television networks, which provide programming over the facilities of affiliated broadcast stations, subscription television programmers, who perform similar functions on stations of television licensees, and pay television programmers such as Home Box Office, whose services are carried via satellites to cable television systems. However, the Commission previously has applied broadcast restraints to programmers and has been upheld in doing so. Columbia Broadcasting System, Inc. v. FCC, 629 F.2d 1, 26 (D.C.Cir.1980) (affirming Commission's authority to apply reasonable access requirements of Section 312(a)(7) to major broadcast networks). The reason the FCC does not ordinarily regulate programmers is a simple one: the Commission applies the statute directly to the entities responsible for program selection and transmission--the broadcast licensees. This approach is consistent with the Act's philosophy, for where a programmer operates through a broadcast licensee who must comply with the statute's broadcast restrictions, as is the case with STV programmers, the networks, and cable, the Act's objectives are met. But when both the customer-programmer and the common carrier through which the former's signals are carried are immunized from broadcast regulation, as they are in the DBS Order, the statutory scheme is completely negated.
 
 
 40
 To avoid this result, we vacate that part of the DBS Order that exempts customer-programmers of DBS common carriers from the statutory requirements imposed on broadcasters. Although DBS presents the Commission with a novel problem in broadcast regulation, the Commission has available a variety of means for regulating DBS consistent with the statutory commands. For example, each satellite could be licensed on a common carrier basis and the lessee of each channel, even if the satellite owner, licensed as a broadcaster. See generally Comment, Direct Broadcast Satellites: Ownership and Access to the New Technology, 33 FED.COMM.L.J. 245 (1981) (discussing possible approaches). Moreover, while we have several times referred to the failure of the FCC to regulate the customer-programmers of DBS common carriers, we do not suggest that it is upon such programmers that the broadcast restrictions must necessarily fall; if a DBS owner leases time slots on a single channel rather than the channel as a whole, it may make more sense to make the satellite owner responsible for compliance with a broadcaster's statutory obligations. We of course intimate no view on the legal sufficiency of any particular approach or on the authority of the FCC to adopt any particular approach. Moreover, while the FCC cannot experiment with its statutory obligations, it has considerably more flexibility with those broadcast restrictions that are the product of Commission regulation rather than congressional command, see, e.g., 47 C.F.R. Sec. 73.1920 (1983) (personal attack rule); if the FCC can offer persuasive reasons for exempting DBS broadcasters as opposed to other broadcasters from these agency-imposed restrictions, the restrictions need not mechanically be applied to DBS.
 
 
 41
 We also do not suggest that all uses of DBS constitute broadcasting; activity that would provide non-general interest, point-to-point service, where the format is of interest to only a narrow class of subscribers and does not implicate the broadcasting objectives of the Act, need not be regulated as broadcasting. See Functional Music, supra (affirming non-broadcast treatment for transmission of background music to restaurants, stores, schools and comparable institutions); cf. Greater Washington Educational Telecommunications Association, Inc., 49 F.C.C.2d 948 (1974) (use of educational FM station's subcarrier for a specialized informational service for the blind).
 
 
 42
 Although we vacate one portion of the DBS Order, the Commission's error with respect to broadcasting is sufficiently minor in the context of the Order as a whole that the rest of the Order can stand. The DBS Order makes clear that a DBS applicant that proposes to produce direct-to-home service and to retain control over the content of the transmissions will be treated as a broadcaster. DBS Order, 90 F.C.C.2d at 709. With respect to such applicants, who comprise the great majority of DBS applicants, id. at 710 n. 82, the DBS Order is thus insulated from our criticism of the FCC's failure to regulate customer-programmers. With respect to DBS applicants who propose to provide service on a common carrier basis--the set of applicants for whom our vacation of the DBS Order is relevant--we leave to the Commission the decision whether a generic rulemaking is required to determine how to apply broadcast restrictions to such DBS systems or whether individual application proceedings can best deal with this question.
 
 
 43
 That we are compelled to vacate a portion of the Interim DBS rules as promulgated does not mean that the STC Decision is infected by a similar defect. On the contrary, STC applied to operate its DBS system as a broadcaster and has agreed to comply with all restrictions applicable to broadcasters. While some of the parties assert that it is unclear whether STC will comply with Title III on each of its three channels or only on its DBS system as a whole, we interpret STC's post-argument letter to this court, dated April 4, 1984, as committing STC to comply with Title III on each channel. As a result, the Commission's departure from its statutory obligations with respect to some DBS systems has no effect on the validity of STC's construction grant; STC will operate as a broadcaster. The validity of the STC Decision is therefore not affected by our decision to vacate a portion of the DBS Order.
 
 
 44
 III. The FCC's Refusal to Apply its Ownership Restrictions to DBS
 
 
 45
 In addition to refusing to impose statutory broadcast restrictions on customer-programmers of DBS common carrier, the FCC also declined to apply to DBS Commission regulations that seek to assure that control of the media is lodged in diverse hands. Traditionally, the FCC has considered diversification of media ownership to be an important objective of federal communications regulatory policy. Diversification is thought to serve the public interest in two ways: by promoting a multitude of program and service viewpoints, an aim embodied by the First Amendment, and by preventing undue concentration of economic power, a concern embraced by the antitrust laws. See FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 780, 98 S.Ct. 2096, 2104, 56 L.Ed.2d 697 (1978). To promote diversification, the Commission has long barred traditional terrestrial television licensees from owning an interest in two television stations that have common or overlapping service areas. 47 C.F.R. Sec. 73.636(a)(1) (1983) (multiple-channel rules). Similarly, Commission rules prohibit any single entity from owning, inter alia, more than a total of seven television stations. Id. at Sec. 73.636(a)(2) (cross-ownership rules).
 
 
 46
 The Interim DBS rules temporarily suspend for DBS both the multiple channel and the cross-ownership rules. The FCC's decision not to apply these rules to DBS rested on two policy judgments: first, and most importantly, that imposition of the rules during the nascency of DBS would unduly hinder development of DBS systems; second, that the rules were also unnecessary because competitive economic forces had so transformed the general video market and were so powerful in the DBS field specifically that abandonment of the rules posed little danger to the values those rules served.
 
 
 47
 The refusal to apply the cross-ownership rules to DBS is not at issue in this case. However, petitioner NAB argues that it was arbitrary and capricious for the FCC to relax temporarily the multiple-channel rule for DBS while leaving that same rule in place for terrestrial licensees.
 
 
 48
 At least at this early stage in the development of DBS, we reject that argument: DBS and traditional television broadcasting are not sufficiently similar in their technology, marketability, capitalization requirements, or other relevant factors that identical regulatory treatment of the two is required. Unlike conventional television systems, DBS systems are extraordinarily capital intensive and have high fixed costs; one applicant estimated that preoperational and first year expenditures alone would be $600 million. STC Application, Volume 1, pp. 66-70 (JA 674). Weighing in against these costs are significant risks which the FCC has found to be associated with the new technology: (i) a lengthy delay (approaching five years) between issuance of a construction permit and initiation of service; (ii) reliance on unproven and developing technology; (iii) an uncertain and rapidly changing marketplace; (iv) operational and marketing problems associated with the provision of service and distribution of home receiving equipment over vast geographic areas. STC Decision, 91 F.C.C.2d at 986-87.
 
 
 49
 These differences led several potential applicants to comment that no "responsible business organization" would enter the DBS field "without control over the programming of more than one channel." See id. at 694; DBS Order, 90 F.C.C.2d at 713 n. 91. Such multiple-channel control allows counter programming, in which a satellite owner can offer movies on one channel, for example, sports on another, and cultural and children's programs on the third--thereby potentially attracting substantially more viewers than would be possible were only a single channel available. Based on the comments of some applicants that the ability to counterprogram was necessary to justify investment in DBS, the FCC concluded that, at least for the time being, it was unwise to impose ownership restrictions comparable to those existing in other areas. However, the FCC expressly reserved the right to impose ownership restrictions if actual operational experience with DBS systems demonstrated the need for increased regulatory intervention.
 
 
 50
 In other areas, the FCC has adopted a similar flexible approach toward new technology thought to be in the public interest. For example, in the early stages of the development of cable television, the FCC refused to restrict the number of channels of origination that a cable owner could operate; such restrictions were thought to constrain desirable experimentation within a new industry. CATV Report and Order, 36 F.C.C.2d 143, 197 (1972). Similarly, during the pioneering stages of FM and VHF broadcasting services, the Commission adopted a relaxed cross-ownership policy to foster their development. See Multiple Ownership Rules, 28 F.C.C.2d 663, 671 (1971) (FM); Multiple Ownership of Standard, FM & TV Broadcast Station, 22 F.C.C.2d 306, 319 (1970) (VHF). While these approaches were not judicially reviewed, they highlight the fact that the Commission previously has viewed stimulation of new technology as a sufficient reason for relaxing its ownership restrictions.
 
 
 51
 In this case, we conclude that the Commission acted within its discretion in suspending the multiple-channel restrictions. As the Commission's past practices suggest, the ownership restrictions are not a statutory requirement but rather a product of the Commission's informed judgment as to what the public interest requires. Substantial evidence was offered to the Commission that DBS would not come to fruition without the incentive of multiple-channel control. The Commission plausibly predicted that DBS may result in new service of substantial benefit to the public and that competition from DBS will further diversity in the video market. We therefore accept the FCC's judgment that suspension of the ownership restrictions will better promote diversity than the mechanical application of those restrictions to this new setting. In light of the significant differences between DBS and conventional television, it was neither arbitrary nor capricious for the Commission to refuse for the time being to apply traditional ownership restrictions to DBS.
 
 
 52
 The Commission offered a second and alternative rationale for refusing to apply the multiple-channel and cross-ownership rules to DBS--that market forces in the burgeoning video industry would serve as adequate surrogates for direct regulation of media ownership. NAB is distressed by this rationale and argues that the same factors that make the video market safe for unconstrained DBS entry should also make that market safe for the repeal of the ownership restrictions on terrestrial broadcasters. NAB's argument may be sound as a matter of policy, but as a matter of law it rings hollow. In classifying economic activity, agencies, while entitled to less deference than Congress, nonetheless need not deal in one fell swoop with the entire breadth of a novel development; instead, "reform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind." Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). The communications field is in the midst of a profound revolution, in which DBS plays a central role; in deciding how to regulate previously non-existent technology, the Commission is empowered to take cognizance of the changes wrought by advancing technology. Computer and Communications Industry Association v. FCC, 693 F.2d 198, 212 (D.C.Cir.1982) (Computer II ) (recognizing that "newly unleashed market forces" may constitute an appropriate regulatory tool), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). But in regulating a new technology such as DBS in light of extant economic and technical forces, the Commission need not reopen at the same time all previous proceedings also arguably affected by those forces; the Commission is not constrained, as NAB would have it, to act in one transcendant blow, radically reshaping much of communications law, or not to act at all. There will be time enough in future proceedings for the Commission to consider whether repeal of existing rules, like the refusal to extend them which we approve today, is warranted in light of general technological and market change. See Multiple Ownership Rules, FCC No. 83-440, adopted Sept. 22, 1983 (proposing to modify substantially the multiple ownership rules as they apply to conventional broadcast stations). We therefore reject NAB's challenge to the Commission's market-competition rationale. That the multiple-channel rules were not repealed for terrestrial broadcasters does not per se invalidate a decision that precludes applicability of such rules to DBS.
 
 
 53
 The fact that we reject NAB's argument, however, does not mean that we endorse the Commission's approach. Indeed, we are not convinced that the DBS Order provides an adequate empirical foundation for the claim that market forces now render ownership restrictions unnecessary. We need not reach that issue today and express no opinion on it, however, for the first rationale offered by the Commission provides an independent and persuasive basis for sustaining the FCC's decision to suspend, at least temporarily, ownership restrictions on DBS.
 
 
 54
 In approving suspension of the ownership restrictions, we add a final caveat. Diversification of media viewpoints and control remains an important component to the FCC's statutory mandate to regulate communications "in the public interest." Neither our approval nor the FCC's action intimates that diversification is no longer salient to the mission with which the Commission has been charged. In consequence, the decision not to apply ownership restrictions to DBS at this time is cabined by the predicates upon which the interim rules are based. Where those predicates do not exist, or when they cease to have vitality, the absence of traditional ownership restrictions on DBS will require close scrutiny from the Commission in the first instance and from the courts in the second. For example, the absence of ownership restrictions on DBS may be particularly worrisome in those remote areas that DBS opens up for television and in which DBS may therefore be the dominant voice. The FCC has indicated its intent to be alert to such possibilities, see, e.g., DBS Order, 90 F.C.C.2d at 713, and, as we previously have said, "this court has no basis for concluding that the Commission is not proceeding, or does not intend to proceed, in the manner" to which it has pledged itself. Wold Communications, supra, at 1476. Similarly, should experience prove that multi-channel ownership and counter-programming are not necessary to provide an adequate return on DBS investments or to create an adequate incentive to construction, ownership restrictions may become warranted. Cf. Telocator Network of America v. FCC, 691 F.2d 525, 550 n. 191 (D.C.Cir.1982) (Commission has broad leeway to stimulate innovative technology but the price of that leeway is the "ongoing obligation to monitor its regulatory programs and make adjustments in light of actual experience."). Such restrictions may take several forms: division between several entities of operational and programming authority, limiting the number of DBS channels on one satellite controlled by a single firm (which may lead to some form of comparative hearings for the remaining channels), limiting the total number of DBS channels controlled by a single firm, or prohibiting cross-ownership of DBS stations by those with substantial other media interests. See generally Note, Direct Broadcast Satellites: Ownership and Access to the New Technology, 33 FED.COMM.L.J. 245, 305 (1981). We emphasize this point so that future DBS applicants, and indeed so that STC itself, whose multi-channel system was approved as an experiment, are not left with the mistaken impression that they have given a permanent charter to several channels. Experimental regulation is limited by the duration of the experiment; multiple channel authority is a contingent right of which an applicant may be defeased should the FCC conclude that defeasance is in the public interest.
 
 
 55
 Lastly, NAB argues that, even if the ownership restrictions can be relaxed as a general matter, the FCC's specific decision in the STC Decision to grant three channels rather than two to STC is unsupported by the evidence. According to NAB, STC's own studies indicated that STC could achieve sufficient economic returns with two channels; it is therefore alleged that the FCC arbitrarily abandoned its multiple-ownership policies when it awarded STC three channels.
 
 
 56
 That argument is refuted by the fact that STC's application at several points expressed the company's judgment that three channels would be necessary to achieve economic viability. See, e.g., STC Application, supra, Volume I, at 66, 69. While it is true that little documentation was offered to allow the Commission intelligibly to choose between a two and a three channel grant, at this early stage in the development of DBS the Commission was entitled to defer to STC's only thinly supported claim that three, rather than two, channels were necessary. The multiple-ownership debate focused primarily on whether more than single channel licensing ought to be permitted; the choice between granting STC two or three channels was much less ventilated and much less significant. Especially in light of the Commission's express reservation of the right to impose multiple-channel restrictions once experience has been garnered with operational DBS systems, see DBS Order, 90 F.C.C.2d at 986, the Commission did not act arbitrarily in seeking to promote DBS by awarding STC, the first DBS applicant, three channels. We therefore approve the grant of three-channel authority to STC and uphold the Commission's suspension for DBS of the multiple-channel rules.
 
 
 57
 IV. The FCC's Decision to Designate the 12 GHz Band Primarily for DBS
 
 
 58
 The DBS Order grants DBS eventual priority in the 12.2-12.7 GHz band (the GHz band). Currently, a variety of terrestrial microwave operators use that band for point-to-point internal and external communications needs. These Fixed Service Users (FS Users) include local governments, banks, newspapers, railroads, utilities, and academic institutions; as of now there are roughly 1900 links licensed in the 12 GHz band. DBS Order, 90 F.C.C.2d at 699. Under the regime created by the DBS Order, these FS Users have a five-year transition period during which they can continue to operate without any need to avoid interference with DBS. After that period, DBS will have priority; to the extent DBS and FS use is then incompatible, FS Users will have to move to other bands. The Commission noted that this displacement deserved "serious attention" and pledged to minimize the relocation costs to FS Users. The Commission did not, however, formulate the complete details of relocation in the DBS proceedings but rather deferred those details to a separate and expedited rulemaking. See infra p. 1212.
 
 
 59
 Several intervenors argue that this spectrum allocation decision is arbitrary and capricious and must be reversed. They do not really quarrel with the Commission's general power to prefer DBS to current FS services, nor could they. See WLVA, Inc. v. FCC, 459 F.2d 1286, 1303 (D.C.Cir.1972) (noting Commission's authority to decide whether to prefer one service over another); Coastal Bend Television Co. v. FCC, 234 F.2d 686, 690 (D.C.Cir.1956) (same). The gravamen of their claim is instead that, because the Commission several times prior to the DBS Order recognized that authorization of DBS in the 12 GHz band "could have a far reaching impact on the existing terrestrial services," World Administrative Radio Conference, 70 F.C.C.2d 1193, 1252 (1978), the Commission could not have concluded whether DBS was in the public's net interest until it had examined the precise effect DBS would have on FS users of the 12 GHz band; this the Commission allegedly failed to do in deferring to a future rulemaking the details of FS relocation. The intervenors assert that, absent careful examination into the availability of alternative spectrum space and the ability (both technical and financial) of FS users to make use of that space, the FCC could not possibly have reached a reasoned decision on the relevant question of how costly DBS would be to FS Users and hence to the public.
 
 
 60
 The circumstances under which the Commission or any other agency may defer resolution of problems raised in a rulemaking have not yet been well elaborated by this court, nor are they capable of being captured in a single doctrinal formulation. The requisite judgment is in essence a pragmatic one. In an ideal world, of course, agencies would act only after comprehensive consideration of how all available alternatives comported with a well-defined policymaking objective, and in some circumstances, statutes indeed mandate that agencies proceed by only such a course. See, e.g., Public Citizen v. Steed, 733 F.2d 93 (D.C.Cir.1984) (National Traffic and Motor Vehicle Safety Act prohibits agency from repealing rule without consideration of alternatives that better maximize statutory objective); see also National Environmental Policy Act of 1969, codified as amended at 42 U.S.C. Secs. 4331-4347 (1982). But administrative action generally occurs against a shifting background in which facts, predictions, and policies are in flux and in which an agency would be paralyzed if all the necessary answers had to be in before any action at all could be taken. See FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978) ("[C]omplete factual support in the record for the Commission's judgment or prediction is not possible or required ...."); see generally Diver, Policymaking Paradigms in Administrative Law, 95 HARV.L.REV. 393, 428 (1981) (Requirement that decisionmaking be comprehensively rational "makes ravenous demands on agencies' limited investigative resources and cognitive faculties. Judged by its demanding standards, policymakers are virtually defenseless against reproof for falling short."). We have therefore recognized the reasonableness of the Commission's decision to engage in incremental rulemaking and to defer resolution of issues raised in a rulemaking even when those issues are "related" to the main ones being considered. See, e.g., Western Union International, Inc. v. FCC, 673 F.2d 539, 543 (D.C.Cir.1982). At the same time, the Commission cannot "restructure [an] entire industry on a piecemeal basis" through a rule that utterly fails to consider how the likely future resolution of crucial issues will affect the rule's rationale. ITT World Communications, Inc. v. FCC, 725 F.2d 732 at 754 (D.C.Cir.1984).
 
 
 61
 Drawing the line between the permissible and the impermissible in this area will generally raise two questions. First, the agency will likely have made some estimation, based upon evolving economic and technological conditions, as to the nature and magnitude of the problem it will have to confront when it comes to resolve the postponed issue. With regard to this aspect of the agency's decision, as long as the agency's predictions about the course of future events are plausible and flow from the factual record compiled, a reviewing court should accept the agency's estimation. FCC v. National Citizens Committee for Broadcasting, supra; see also National Association of Regulated Utility Commissioners v. FCC, 737 F.2d 1095 at 1117 (D.C.Cir.1984); Wold Communications, supra at 1479. Second, once the nature and magnitude of the unresolved issue is determined, the relevant question is whether it was reasonable, in the context of the decisions made in the proceeding under review, for the agency to have deferred the issue to the future. With respect to that question, postponement will be most easily justified when an agency acts against a background of rapid technical and social change and when the agency's initial decision as a practical matter is reversible should the future proceedings yield drastically unexpected results. In contrast, an incremental approach to agency decision making is least justified when small errors in predictive judgments can have catastrophic effects on the public welfare or when future proceedings are likely to be systemically defective in taking into account certain relevant interests. See Diver, supra, at 430-31; Natural Resources Defense Council, Inc. v. NRC, 547 F.2d 633, 658 (D.C.Cir.1976) (Tamm, J., concurring) (an agency cannot "reckless[ly] decide to mortgage the future for the present, glibly assuring critics that technological advancement can be counted upon to save us from the consequences of our decisions."). Beyond these general guidelines, further delineation of the factors that give content to the requirement that agency deference to future proceedings be pragmatically justified must await case-by-case elaboration.
 
 
 62
 In this case, we conclude the Commission acted reasonably in postponing the details of FS relocation to a future proceeding. First, the Commission acted against an evolving background; neither the demand for FS spectrum space over the next several years nor the actual amount of space on the 12 GHz band that novel DBS technology will in fact occupy can be known at the present. As a result, too fine a calibration of the relocation of FS Users would have been premature. Second, while the impact of DBS on FS users is certainly of substantial concern, and while the Commission agreed that that impact deserved "serious attention," the impact of DBS on FS users was not the central element necessary to a calculus of whether DBS was in the public interest; the central question was instead how DBS would affect existing broadcasters. See DBS Order, 90 F.C.C.2d at 697 ("We believe that the potential benefits of DBS justify some adjustments in other services."). Third, the FCC clearly decided that the public interest warranted preferring DBS to FS even if significant costs were thereby imposed on FS Users. Id. With the exception of public safety FS Users, discussed below, this was a judgment which the Commission was entitled to make and to which we traditionally defer. See 47 U.S.C. Sec. 304 (license does not create entitlement); FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 474, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940) ("The policy of the Act is clear that no person is to have anything in the nature of a property right as the result of the granting of a license."); see also Coastal Bend Television Co. v. FCC, supra, 234 F.2d at 690 (noting deference to Commission decisions to prefer one service over another). And since the very purpose of adopting interim DBS rules was to encourage and facilitate rapid development of DBS technology, a sensible aim in light of the long lead-times needed to make DBS operational and in view of the Commission's judgment that such rules would further the ability of the U.S. to garner orbital and frequency slots at RARC-83 for U.S. DBS systems, the Commission had a sound pragmatic basis for deferring FS relocation to a future proceeding.
 
 
 63
 Finally, unlike ITT World Communications, supra, in this case the Commission was not oblivious to the problems it was postponing or to their likely resolution. The Commission estimated that between 50 and 90 per cent of existing FS stations could be accommodated in the 18 GHz or higher bands, and tentatively identified other bands, to which relocation would be cheaper than to 18 GHz, which it would seek to clear in various ways for FS Users. DBS Order at 702-03. Of course not all frequencies will be available in all areas, and some licensees may face substantial relocation costs, but the Commission relied on its familiarity with the spectrum to conclude that most FS Users could be accommodated at reasonable cost. While intervenors dispute the accuracy of the Commission's predictions, those predictions are not so manifestly devoid of a factual basis as to allow this court to second guess the agency. See FCC v. National Citizens Committee for Broadcasting, supra. In addition, the Commission was aware of the costs that relocation to various bands might pose, see DBS Order at 700 n. 2 (cost of relocation to 18 GHz band estimated at $88,000); id. at 703 n. 61 (cost of relocation to bands adjacent to 12 GHz band estimated at $2,000), and took several steps to mitigate these costs. By grandfathering existing FS Users in for five years, the Commission gave FS Users some flexibility to coordinate their spectrum shift with such factors as equipment depreciation and other time-dependent factors. The five-year period is particularly generous given that, since 1979, licnesees of the 12.2-12.7 GHz band have been on notice that they might have to accommodate DBS. See Notice of Proposed Policy Statement and Rulemaking, 86 F.C.C.2d 719, 735 n. 33 (1981). FS Users were also allowed to remain on the 12 GHz band after the transition period as long as no harmful interference to DBS operations results. Lastly, should technical or financial constraints make relocation impossible, the Commission made clear its willingness to entertain petitions for special relief--relief which may include permission to remain on the 12 GHz band, extension of the transition period, or absorption of some relocation costs by the DBS operator. Reconsideration Order, FCC No. 83-241 at 10 & n. 9 (1983).
 
 
 64
 There is no doubt that FS users will be affected should DBS become operational, and despite the steps outlined above, some FS Users will likely incur substantial relocation costs--perhaps even loss of their ability to broadcast--as a result of the Commission's decisions. The Act, however, requires the Commission to promote the public interest, not to protect individual licensees. FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 474, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940). The Commission, recognizing the possibility of FS User harm, reasonably concluded that it could best fulfill its public interest obligations by authorizing DBS now and considering later the problems faced by FS users.
 
 
 65
 We note finally that the relevant future proceedings were already in progress at the time of the DBS Order and the Commission had pledged to complete those proceedings by a fixed date that itself merely triggered the five-year period after which relocation would be required; the future proceedings deferred to were thus sufficiently concrete and sufficiently tied to implementation of the policy as a whole that this court was not left to speculate about the likelihood that the agency would expeditiously tie up the loose ends left over from the DBS proceeding. Those proceedings have now been completed, Establishment of a Spectrum Utilization Policy for the Fixed and Mobile Services' Use of Certain Bands Between 947 MHz and 40 GHz, FCC No. 83-393 (released Sept. 30, 1983) (FS Proceeding ), which confirms the Commission's pledge to act promptly. The FS Proceeding is of course not part of the record on review of the DBS Order and we therefore do not examine its conclusions to determine whether the agency's predictions have been borne out.
 
 
 66
 Nonetheless, the fact that those proceedings are now complete raises an important point: the authority of an agency to defer issues to the future implies a correlative responsibility that the agency reexamine its initial decision when the verdict which the future returns on the agency's predictions substantially undermines the basis of the initial decision. Thus, if the FS Proceedings reveal that relocation will be substantially more difficult, either technically or financially, than assumed in the DBS Order, and if the Commission believes that that new information casts serious doubt on the conclusion that allocating the 12 GHz band to DBS is in the public interest, the Commission is obligated to reconsider the policy judgments announced in the DBS Order. See Telocator Network of America v. FCC, quoted supra at 1208.
 
 
 67
 What we have said thus far applies to the general class of FS Users. However, approximately 25% of current FS Users are local governments which use the band for vital public safety purposes. DBS Notice, 86 F.C.C.2d at 731. The Commission has a special statutory obligation with respect to these FS Users. This obligation traces to the mandate that the Commission allocate the spectrum in a manner that promotes the "safety of life and property," 47 U.S.C. Sec. 151. While this mandate does not grant public safety broadcasters an absolute right to a particular spot in the spectrum, we do believe it requires the FCC to give their needs priority over those of commercial broadcasters such as DBS. Although not dependent on this fact, our interpretation of Section 151 is buttressed by Congress' reaffirmation and elaboration of this mandate on several occasions; the Communications Amendments Act of 1982, Pub.L. No. 97-259, 96 Stat. 1096, for example, states that "[i]n taking actions to manage the spectrum to be made available for use by the private land mobile services, the Commission shall consider, consistent with section 151 of this title, whether such actions will (1) promote the safety of life and property ...." 47 U.S.C. Sec. 332(a) (Supp.1983); the Senate Committee Report on this legislation states that "radio services which are necessary for the safety of life and property deserve more consideration in allocating spectrum than those services which are more in the nature of convenience or luxury." S.Rep. No. 191, 97th Cong., 2d Sess. 14 (1981), reprinted in [1982] U.S.Code Cong. & Ad.News 2237, 2250. Similarly, 1983 appropriations legislation for the FCC incorporates the following provision:
 
 
 68
 Sec. 9. (a) Funds authorized to be appropriated under section 2 of this Act shall be used by the [FCC] to establish a plan which adequately ensures that the needs of State and local public safety authorities would be taken into account in making allocations of the electromagnetic spectrum....
 
 
 69
 (b) Pending adoption of a plan, the Commission, while making assignments and allocations, shall duly recognize the needs of State and local public safety authorities.
 
 
 70
 Pub.L. No. 98-214, 97 Stat. 1467. Again, the legislative history is clear: "The Committee believes, as it has stated on prior occasions, that public safety consideration should be a top priority when frequency allocation decisions are made." House Rep. No. 98-356, 98th Cong., 1st Sess. 27 (1983), reprinted in 1983 U.S.Code & Cong.News 2219, 2237.
 
 
 71
 We recognize that subsequent legislation cannot redefine the intent of the original enacting Congress and we also realize that neither of these amendments were part of the law at the time the DBS Order was issued. Nonetheless, in light of the fact that these amendments were conceived of as merely articulating the meaning already present in Section 151, see Sen.Rep. No. 97-191, supra, at 14; House Rep. No. 98-356, supra, at 27, the amending Congresses may have intended that they be applied to agency decisions still pending for judicial review on the date of enactment; if the DBS Order were inconsistent with Section 9(b) of the 1983 Amendments, we might well have to remand to allow the Commission to reconsider its decision in light of these amendments.
 
 
 72
 It is therefore troubling that the DBS Order itself gave no consideration as to how the needs of public safety broadcasters would be affected by DBS and how those needs would be accommodated. Cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (agency must consider all relevant factors). We believe that subsequent Commission actions have sufficiently rectified that failing, however, as to allow the DBS Order to stand. After the County of Los Angeles filed a reconsideration petition in which it sought to impress upon the Commission the serious problems the DBS Order might pose for public safety broadcasting, the Commission issued a Reconsideration Order in which it acknowledged that, if specific safety problems were created by the proposed relocation, the FCC had "both the duty and the means to address and rectify them as they arise." FCC No. 83-241 at 10 (May 19, 1983). That Reconsideration Order is properly part of the agency decision under review. The order further indicated that specific relief would be forthcoming to protect public safety broadcasters once the specific relocation problems they faced--technical, financial or other--were known; such relief is to include acceptance of interference to DBS services in specific locations, compensation from DBS operators for relocation costs, and/or extension of the transition period. Id. at n. 9.
 
 
 73
 Both at oral argument and at briefing the Commission represented to this court that "[i]t would be unthinkable for the Commission to allow DBS to threaten the vital public safety radio services presently produced" on the 12 GHz band and the Commission therefore pledged to "guarantee the integrity of ... safety and emergency services." Brief for the FCC at 44 n. 54. We agree with these interpretations of the Commission's statutory obligations and emphasize that the Commission has stated its commitment to fulfill this acknowledged duty. See Wold Communications, supra, at 1476. Because such a small percentage of FS users are local governments, and because we have not been presented with a specific case of a public safety broadcaster who has suffered any concrete harm from the DBS Order and from the Commission's failure to grant specific relief, we accept the Commission's statements in the Reconsideration Order and its representations to this court as sufficient correctives for any deficiencies that may have infected the DBS Order on this issue.
 
 
 74
 Finally, we reject the contention of intervenor Association of Maximum Service Telecasters that the Commission was required to set aside a portion of the 12 GHz band for terrestrial high-definition television, which produces enhanced picture quality. The Commission expressly considered this contention and decided to prefer DBS, see DBS Order, 90 F.C.C.2d at 704-05. We defer to the Commission's judgment in this complex proceeding as to which service is more in the public interest. With the important caveat we have added that public safety broadcasters are not to be unduly burdened by DBS, we therefore hold that the Commission's spectrum-allocation decision was reasonable.
 
 
 75
 V. Whether the Grant of DBS Authority to STC Comports with Applicable Statutes
 
 
 76
 In addition to challenging the validity of the general regulatory approach to DBS taken by the FCC, NAB and several intervenors take issue with the more specific grant of a DBS license to STC. STC is a subsidiary of COMSAT, a private corporation created by Congress for the purpose of developing an international communications satellite system. See The Communications Satellite Act of 1962, supra (the Satellite Act). The Satellite Act contemplated a system operated by a number of nations on a cooperative basis. On August 20, 1964, an Executive Agreement signed by the United States and ten other nations created the International Telecommunications Satellite Consortium (INTELSAT), which assumed ownership of the international system from COMSAT. See generally ITT World Communications, Inc. v. FCC, 725 F.2d 732, 736 n. 4 (D.C.Cir.1984). COMSAT became the U.S. representative to INTELSAT and the sole U.S. entity permitted access to the system. In 1978, COMSAT's role in the international communications field was expanded by the International Maritime Satellite Telecommunications Act, 47 U.S.C. Secs. 751-757, which designated COMSAT as the U.S. participant in INMARSAT, an international organization established to develop and operate a commercial global maritime satellite system.
 
 
 77
 COMSAT's entry into DBS via its subsidiary STC is a significant departure from the specific international roles that Congress carved out for COMSAT and from COMSAT's past activities. STC's DBS venture launches COMSAT into an area of novel private enterprise requiring massive capital outlays and, for the first time, will involve COMSAT in broadcast activities. (As noted above, STC's DBS application asked that STC be licensed as a broadcaster). In addition, COMSAT has assumed substantial responsibilities for STC's DBS-related financial ventures. See infra pp. 1218-1219.
 
 
 78
 Petitioner NAB and supporting intervenors argue that the Satellite Act precludes the FCC from authorizing COMSAT to engage, through STC, in DBS operations. Alternatively, even if STC may enter the DBS field, NAB argues that the Commission should have held a hearing to determine whether COMSAT's participation in STC's DBS venture constituted improper cross-subsidization and whether that participation threatened COMSAT's ability to carry out its INTELSAT/INMARSET responsibilities. We reject all of these claims.
 
 
 79
 A. COMSAT's power to engage in broadcast activities
 
 
 80
 The claim that COMSAT, and hence STC, is barred from engaging in DBS rests on two foundations. The first is section 201(c)(8) of the Satellite Act, which provides that
 
 
 81
 (c) the Federal Communications Commission, in its administration of the provisions of the Communications Act of 1934, as amended, and as supplemented by this Act, shall--
 
 
 82
 (8) authorize [COMSAT] to issue any shares of capital stock ... or to borrow any moneys, or to assume any obligation in respect to the securities of any other person, upon a finding that such issuance, borrowing, or assumption is compatible with the public interest, convenience, and necessity and is necessary or appropriate for or consistent with carrying out the purposes and objectives of this Act by the corporation.
 
 
 83
 47 U.S.C. Sec. 721(c)(8) (emphasis added).
 
 
 84
 NAB argues that, to be "consistent with" the Satellite Act, COMSAT's activities must further its operation of a common carrier system for international communications. Second, NAB points to various provisions of the Act, see, e.g., section 305(a)(1), 47 U.S.C. Sec. 735(a)(1), section 305(a)(2), 47 U.S.C. Sec. 735(a)(2), and section 304(b)(2), 47 U.S.C. Sec. 734(b)(2), as well as to various statements in the legislative history, which purportedly establish that COMSAT's activities, whatever their nature, must be those of a common carrier; broadcasting, according to this second claim, is ultra vires COMSAT's delegated power.
 
 
 85
 These arguments were presented to the Commission and rejected by it. In response to NAB's first argument, the Commission asserted its longstanding position that COMSAT's engagement in non-common carrier activities is "consistent with" the Act as long as those activities do not impair COMSAT's ability to fulfill its INTELSAT/INMARSAT responsibilities. That position was firmly taken by the Commission in 1978 when, pursuant to congressional directive, 47 U.S.C. Sec. 754, the Commission launched a comprehensive review to determine the sorts of competitive businesses into which COMSAT could enter. COMSAT Study, 77 F.C.C.2d 564 (1980). The 250-page report that resulted concluded "that the 1962 Satellite Act is not a bar to COMSAT's involvement in activities that do not necessarily further the global system, so long as such activities are not inconsistent with, and do not interfere with, the purposes and objectives of the 1962 Satellite Act." Id. at 618. Mirroring that formal conclusion, the Commission both before and since the COMSAT Study has allowed COMSAT to provide a variety of services unrelated to its INTELSAT/INMARSAT responsibilities. For instance, COMSAT has been authorized to provide domestic satellite services. Satellite Business System, 62 F.C.C.2d 997 (1977), aff'd sub nom. United States v. FCC, 652 F.2d 72 (D.C.Cir.1980) (en banc ) (not expressly reaching issue of COMSAT's authority under the Satellite Act to offer such services). Other COMSAT ventures approved by the FCC include the manufacture of telecommunications equipment, provision of consultative services to satellite systems, and the development of computer technologies. See STC Decision, 91 F.C.C.2d at 963.
 
 
 86
 No court has thus far passed on the validity of the Commission's long-standing interpretation of section 201(c)(8). We therefore reach this question and uphold the Commission's interpretation as it applies to the facts of this case. In our view, the key defect in NAB's argument on section 201(c)(8) is that it grants too narrow a realm to the purposes of the Satellite Act. NAB concedes that COMSAT can engage in activities that are "necessary or appropriate for ... the purposes and objectives" of the Act, Reply Brief for NAB at 13 n. 35, but then asserts that those purposes are limited to the provision of common carrier services for INTELSAT/INMARSAT customers. We read the Act as more far-ranging in its aims; its stated goal was to establish a global communications satellite system that would confer the benefits of satellite technology upon both U.S. citizens and citizens of other countries. See 47 U.S.C. Sec. 701(d); see also S.Rep. No. 1584, 87th Cong., 2d Sess. 10 (1962) (statement of Senator Long). Because the global system envisaged by the Act has been successfully established, COMSAT Study, 77 F.C.C.2d at 569, COMSAT's role in INTELSAT has diminished. Yet COMSAT, by virtue of its past position as manager of INTELSAT and its significant corporate experience with satellite technology, has developed sustained expertise with respect to ventures in which satellite communications form an integral part. Id. at 579. Limiting COMSAT to INTERSAT/INMARSAT related activities would deprive the public of the very substantial benefits to be derived from the company's application of its expertise to areas of developing satellite communications technology and practice. Standing on its own, the statutory language upon which such a limitation would be based is not sufficiently plain or compelling to warrant our taking this step. See Columbia Broadcasting System v. Democratic National Committee, 412 U.S. 94, 121, 93 S.Ct. 2080, 2095, 36 L.Ed.2d 772 (1973).
 
 
 87
 We also do not believe that NAB's second basis for attacking the grant of a DBS application to STC--that the Act and its history limit COMSAT to common carrier activities--is convincing enough to justify overturning the FCC's interpretation of its statutory responsibility. Typical of NAB's support for its position is section 401 of the Act, which states that COMSAT "shall be deemed to be a common carrier ...," 47 U.S.C. Sec. 741, and the following statements made to Congress by then-FCC Chairman Minow:
 
 
 88
 Unlike other carriers, the Corporation will not furnish service to the general public.... Its undertaking, rather, will be to furnish channels of communications to relatively few users, namely, common carriers and their foreign counterparts, who do serve the general public.
 
 
 89
 Hearings on S. 2814 before the Senate Committee on Commerce, 87th Cong., 2d Sess. 65 (1962) (emphasis added).
 
 
 90
 [B]roadcasters ... will be customers of a common carrier, who, in turn ... will derive facilities from the satellite corporation, and anything having to do with the content of the program would not be a matter of the satellite corporation but, rather, of whoever is a licensed broadcaster.
 
 
 91
 Hearings on H.R. 11040 before the Senate Committee on Foreign Relations, 87th Cong., 2d Sess. 97 (1962) (emphasis added).
 
 
 92
 As the Commission long has recognized, however, "many of the provisions of the 1962 Act make sense only in the international field and are anomalous in a domestic context." Domestic Communication-Satellite Facilities, 22 F.C.C.2d 86, 131 (1976). The cited provisions and statements are of precisely this character. Designation of COMSAT as a "common carrier" in section 401 was intended to deal with a problem unique to COMSAT's international functions; the legislative history of this section makes plain that Congress was concerned that COMSAT's INTELSAT service might not be classified as common carriage because it was to be available to only domestic carriers and other "authorized" entities. Accordingly, Congress enacted section 401 to ensure that these operations would be subject to appropriate common carrier regulation. See S.Rep. No. 1584, 87th Cong., 2d Sess. 23 (1962). Section 401 thus does not require that COMSAT's non-INTELSAT businesses be operated on a common carrier basis.
 
 
 93
 More generally, the Satellite Act designated COMSAT as a common carrier only for purposes of its participation in INTELSAT, to assure that the Commission would have jurisdiction to preclude COMSAT from exploiting its monopoly position in INTELSAT in setting rates. The statements of Chairman Minow, as well as similar statements cited in NAB's Brief, must be read in this context. Those statements are set not in a discussion of COMSAT's general corporate powers, but in a narrower analysis of its role as a common carrier in the provision of international communications services. We have recently rejected a similar attempt to rely on isolated statements in the Act's legislative history to limit COMSAT's powers. In ITT World Communications, supra, this court upheld the FCC's power to allow COMSAT to lease satellite channels to non-common carriers designated by the FCC as authorized end users. Despite several congressional statements that COMSAT was to be a "carrier's carrier," we refused to hold that Congress intended forever to restrict COMSAT's competition for retail business. Instead, we construed those statements against the Act's "primary purpose to: to establish ... as expeditiously as practicable a commercial communications satellite system. 47 U.S.C. Sec. 701(a)" (emphasis added in opinion) and found those statements limited by that purpose. So too in this case statements defining COMSAT's role in INTELSAT should not be transformed into limitations on the exercises of corporate powers that further the development of satellite communications technology, for that aim is certainly within the scope of purposes for which the Satellite Act was passed.
 
 
 94
 Recent amendments to the Satellite Act buttress the conclusion that COMSAT may engage in non-common carrier activities. These amendments, enacted as the 1978 International Maritime Satellite Communications Act, supra, state that COMSAT may not interconnect the INMARSAT system with "any common carrier or other entity in which [COMSAT] has any ownership interest," and that the Commission is to determine the arrangements under which COMSAT interconnects with carriers "other than any common carrier, system, or other entity in which [COMSAT] has any ownership interest." 47 U.S.C. Secs. 752(c)(2) and Sec. 752(g) (Supp. V 1981) (emphasis added). While the enactments of a subsequent Congress cannot redefine the intent of the original enacting Congress, those enactments may be of some aid in illuminating the original intent; that is particularly so where, as in this case, Congress at the first stage has delegated broad authority in an uncharted and rapidly evolving area and at the second stage has acted to clarify with more precision the scope of the delegated power. Thus, we view these amendments as significant indicators that Congress intended COMSAT to engage in at least some non-common carrier activities.
 
 
 95
 The 1978 Amendments are of further significance because, as noted above, they specifically directed the FCC to conduct a study of the corporate structure and operations of COMSAT to determine the sort of added responsibilities COMSAT could assume safely while remaining able to carry out effectively the functions assigned to it by the Satellite Act. 47 U.S.C. Sec. 754. After adopting its "not inconsistent" with the purposes of the Act standard, the Commission noted that controversy would undoubtedly surround application of that standard to particular proposed activities and therefore suggested that Congress provide more specific guidance on scope of permissible COMSAT activities. Id. at 618-619. Congress and the FCC are thus engaged in an ongoing colloquy to define the role of this private corporation charged with important public duties in an area of rapid technological change. The judiciary has little to contribute to this exchange in light of the lack of legislative attention directed to COMSAT's general corporate powers at the time the Act was passed. Because the statutory language--"necessary, appropriate for, and consistent with"--is broad enough to tolerate the Commission's standard, we believe deference to the ongoing discussion of this issue by the other branches is appropriate. We therefore find no legal barrier to the FCC's approval of STC's application to construct a DBS system.
 
 
 96
 In holding that COMSAT may engage in certain non-INTELSAT or INMARSAT activities even when those activities are not ancillary to its INTELSAT/INMARSAT responsibilities, we do not suggest that COMSAT can engage in any business ventures it desires; despite the colorful drafting of NAB's arguments, we need not decide today whether the FCC intends or is authorized to allow COMSAT to participate in venture's involving "department stores, dairy farms, football, or fountain pens." We hold only that, at least when COMSAT's activities are directed to the purposes for which it was created--the development of satellite communications technology, see 47 U.S.C. Sec. 701--COMSAT's activities are "consistent with" the purposes of the 1962 Act within the meaning of section 201(c)(8). Participation in DBS meets this standard.
 
 
 97
 B. Whether STC's DBS Venture will Impair COMSAT's Ability to Fulfill its Statutory Obligations or Burden COMSAT's Ratepayers
 
 
 98
 Even if COMSAT is not barred as a matter of law from activities that do not threaten its international responsibilities, NAB and others argue that STC's DBS venture will threaten those responsibilities. In addition, these opponents of STC's application argue that COMSAT's ratepayers will end up bearing increased capital costs as a result of COMSAT's partial funding of STC's DBS venture. Thus, STC's application allegedly should have been denied; at the least, according to NAB and its supporters, the Commission was first required to hold an evidentiary hearing before concluding that neither COMSAT nor its ratepayers would be adversely affected by STC's DBS venture.
 
 
 99
 STC projects the cost of its system through the first year of operation (1986-87) to be approximately $600 million. It plans to meet these expenses through a $225 million equity contribution from COMSAT and through STC's borrowing ability and revenue sources. All loans to STC are to be collateralized by STC assets and recourse to COMSAT in the form of an unconditional guarantee up to $200 million for the term of the loan. The guarantee is limited to the tax savings COMSAT will accrue on a consolidated tax return due to the investment tax credits STC will receive and the initial losses that STC will experience. In addition to this limitation, the Commission relied on a series of other structural limitations to assure that the loan guarantee and STC's operations in general would not affect COMSAT adversely. Specifically, the Commission stated that
 
 
 100
 (a) STC must first use all reasonable means to secure capital from external financial markets before approaching the Commission for permission to obtain additional financing from COMSAT beyond the original $225 million contribution;
 
 
 101
 (b) Commission approval is required for any COMSAT guarantees of additional STC loans;
 
 
 102
 (c) the Commission has imposed structural, accounting, and other requirements designed to monitor transactions between STC and COMSAT; and
 
 
 103
 (d) the Commission has reserved the right to require modifications in COMSAT's corporate structure, including divestiture of STC, if at any time the agency finds that the STC venture threatens to affect adversely COMSAT's pursuit of its statutory mission.
 
 
 104
 STC Decision, 91 F.C.C.2d at 965-73. On the basis of these limitations, the FCC concluded that STC's DBS venture would pose no threat to COMSAT's international responsibilities.
 
 
 105
 We do not share the Commission's firm conviction that these conditions absolutely assure that COMSAT's equity contribution to STC will not affect COMSAT's INTELSAT/INMARSAT role. Id. at 972. The Commission reached its conclusion by simply calculating COMSAT's expected cash flow and then showing that this cash flow, combined with additional financing likely to be available to COMSAT, was significantly greater than the required $225 million equity contribution to STC. Yet several of the assumptions underlying the Commission's calculation are subject to question, such as the amount of debt capacity actually available to COMSAT. See STC Decision, supra, Appendix to Concurring Statement of Chairman Rivera. In addition, it seems certain that COMSAT's general participation in DBS does rather clearly put the corporation at some risk; as intervenor Forward Communications Corporation points out, for example, a total default by STC would almost surely make it more difficult for COMSAT to raise future capital for INTELSAT/INMARSAT projects.
 
 
 106
 Nonetheless, we decline to overturn the Commission's judgment that COMSAT participation in DBS will not threaten COMSAT's international responsibilities. First, the precautions taken by the Commission mean that, even if STC's costs have been greatly underestimated, COMSAT operations would not be threatened unless STC found itself without borrowing capacity, turned to COMSAT for funds, and received Commission approval despite evidence of a threat to INTELSAT and INMARSAT. We decline to assume that the Commission will not be vigilant in reviewing such requests. When the granting of additional funding requests would significantly threaten COMSAT's ability to carry out its statutory duties, we must assume that the Commission will carry out its statutory obligations. We also note that the Commission has stated that it will require corporate modifications, including complete divestiture, should they be necessary to preserve COMSAT's INTELSAT and INMARSAT roles. STC Decision, 91 F.C.C. at 973.
 
 
 107
 More generally, we have held supra that COMSAT may enter into at least some non-INTELSAT/INMARSAT ventures. The riskiness of any such venture is first assessed by COMSAT's directors and then by the Commission, and we have no special expertise that allows us to sit as a super-board of directors to oversee the business judgments reached by COMSAT or to overturn the Commission's review of those judgments. Nor do we believe Congress has thrust this role upon us, rather than upon the agency which is intimately familiar with COMSAT's operations. We therefore must defer substantially in individual cases to the Commission's review of COMSAT's business judgments, provided that the Commission's conclusion is reasonable. The Commission could have been much more forthright in delineating the general framework within which it will assess the level of acceptable risks and in establishing the financial bounds beyond which the Commission will preclude COMSAT from stepping; ventures on the order of DBS, in which COMSAT's equity contribution is 30-35% of the combined equity of COMSAT and STC, should not be approved nonchalantly. Nonetheless, because we find the Commission's has not performed its oversight duties unreasonably in this case, we acquiesce in the Commission's approval of COMSAT's business judgment.
 
 
 108
 We also see no basis for concluding that COMSAT will be able to exact monopoly rates from its INTELSAT/INMARSAT ratepayers to cover any of STC's losses. The Commission has made clear that it will "base COMSAT's allowable rate of return for INTELSAT/INMARSAT activities solely on the cost of capital for those activities." STC Decision, 91 F.C.C.2d at 971. The structural separation and other precautions imposed by the Commission will, in the Commission's view, effectively prevent cross-subsidization of STC by COMSAT ratepayers, and we typically accept the Commission's view on such matters. Computer II, supra, 693 F.2d at 219; see also ITT World Communications, Inc., 88 F.C.C.2d 201 (1981) (employing similar structural constraints to prevent cross-subsidization). Impermissible cross-subsidization will therefore not inevitably follow in the wake of STC's DBS venture. As a result, any increased cost of capital to COMSAT attributable to STC's operations should be borne by COMSAT's stockholders rather than by its ratepayers.
 
 
 109
 Finally, we do not believe the FCC was required to hold an evidentiary hearing on these challenges to COMSAT's participation in STC's DBS venture. Section 309(d) of the Communications Act requires the Commission to hold a hearing if "questions of fact" that are both "substantial and material" are raised in a petition to deny an application for a license. 47 U.S.C. Sec. 309(d)(2) (1982). This section of the Act does not require evidentiary hearings, however, for questions the resolution of which depends primarily on the Commission's policy choices or predictive judgments. Moreover, in reviewing FCC decisions not to hold hearings,
 
 
 110
 the scope of our review is quite narrow; we defer to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious, or unreasonable. And it is clear that the decision of when hearings are necessary or desirable to clarify issues is one which lies in the first instance with the Commission.
 
 
 111
 West Michigan Telecasters v. FCC, 396 F.2d 688, 691 (D.C.Cir.1968) (citations omitted); accord National Association for Better Broadcasting v. FCC, 591 F.2d 812, 816 (D.C.Cir.1978). In this case, it was reasonable for the Commission to conclude that an evidentiary hearing would not add to what was essentially a policy judgment that the risks to COMSAT of STC's DBS venture were tolerable and to what was at base a prediction, which "flowed logically from the evidence," Communications Investment Corp. v. FCC, 641 F.2d 954, 972 (D.C.Cir.1981), that no cross-subsidization would occur. Accordingly, a hearing on the issues of cross-subsidization and threat to COMSAT's international duties was not required.
 
 VI. Procedural Challenges
 
 112
 A host of other procedural challenges is also presented. The most important of these is based on this court's decision in Carroll Broadcasting v. FCC, 258 F.2d 440 (D.C.Cir.1958), in which we held that, "when an existing licensee offers to prove that the economic effect of another [rival] station would be detrimental to the public interest" in that grant of a license to the rival would lead to a net loss of public service programming, the Commission is required to consider this claim in a full-scale evidentiary hearing and to make findings on it before granting the license. NAB and others argue that the Commission should have held a Carroll hearing before granting STC's DBS application.
 
 
 113
 We disagree. The Carroll doctrine and its subsequent codification at 47 U.S.C. Sec. 309 were never intended for a situation such as the one presented here. Carroll dealt with a case in which an existing licensee claimed that the addition of another station to a broadcast area would diminish service because competition between the two stations would preclude either from effectively serving the community; the premise of Carroll is thus that, while competition is generally in the public interest, at times it may not be. Id. at 443. The purpose of a Carroll hearing is to allow the FCC to make a focused inquiry into the validity in a particular case of the general presumption that competition furthers the public interest.
 
 
 114
 That very purpose, however, has already been satisfied in this case. Before granting STC's license application, the FCC in the DBS proceedings engaged in extended rulemaking in which a central issue was whether DBS service, in light of its potential impact on local broadcasting, was in the public's net interest. The DBS Order concluded that, for the country as a whole, DBS competition was in the public interest--despite the inability of DBS to broadcast local programming and even given the possibility that terrestrial broadcasters might suffer some audience loss and that some stations might be destroyed altogether. See DBS Order, 90 F.C.C.2d at 682-83; cf. Carroll, supra at 443 ("Competitors may severely injure each other to the great benefit of the public."). The grant of an individual DBS license, unlike a traditional broadcast license, authorizes regional or national service, and it is precisely this sort of service that the DBS Order concludes is in the public's net interest. Thus, a Carroll hearing under these circumstances would force the agency to redecide in an evidentiary hearing the very question it has already resolved through informal rulemaking. It was never the aim of Carroll to force such duplicative hearings.
 
 
 115
 Moreover, because the Communications Act does not require FCC rulemaking proceedings to be on the record, a court cannot require that the FCC adopt formal rulemaking proceedings to resolve such an issue. United States v. Florida East Coast Railway Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Yet extending Carroll to the instant case would have precisely such an effect, for the FCC would then have to engage in protracted and formal evidentiary hearings to determine whether DBS was in the public interest. To the extent Carroll has been codified in Section 309, Vermont Yankee of course stands as no barrier to formalization of the FCC rulemaking process; but we find it implausible that Congress intended Section 309, which deals with applications for individual licenses, to alter radically the course of FCC rulemaking proceedings. We therefore are hesitant to extend Carroll to the present case.
 
 
 116
 Only if there were convincing reasons to expect that the conclusions of the DBS Order were inapplicable to the particular region of the country for which a DBS license was sought would there be any basis for considering whether a Carroll hearing was needed; we are hard pressed to imagine how such a situation could arise and, in any event, we conclude that NAB has not demonstrated that such a situation exists in this case. NAB argues that subscription television stations on the East Coast, the general area to which STC's initial license applies, will be hurt by DBS, and that six UHF stations in this area may be destroyed by DBS. There is nothing to indicate, however, that these possibilities are distinct to the Eastern Service Area of STC as compared to the rest of the country. Absent convincing evidence of such a distinction, the FCC had no obligation to reexamine through a Carroll hearing the very issues it had decided in the DBS proceedings. Cf. WLVA, Inc. v. FCC, 459 F.2d 1286, 1297 (D.C.Cir.1972) ("[A] petitioner seeking a hearing on the Carroll issue must plead specific factual data sufficient to make out a prima facie case that the economic consequences of a grant of the challenged application will lead to an overall derogation of service to the public."). The FCC therefore did not err in refusing to hold such a hearing.
 
 
 117
 We pause to consider briefly one other procedural challenge to the DBS Order and the STC Decision. NAB claims that the Commission unlawfully "rushed to judgment" by not first finalizing the DBS rulemaking before considering STC's individual application. The Commission instead acted on the DBS rules and the STC application at the same time. See supra at 1196. Yet we have noted previously the broad discretion with which Congress has invested the Commission to adopt whatever procedures "will best conduce to the proper dispatch of business and to the ends of justice," 47 U.S.C. Sec. 154(j) (1976); see generally Chisholm v. FCC, 538 F.2d 349, 364-66 (D.C.Cir.), cert. denied sub nom. Democratic National Committee v. FCC, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). And the Commission, like most other agencies, is free to choose to announce rules of general applicability in the context of an individual licensing proceeding. SEC v. Chenery, 332 U.S. 194, 202-03, 67 S.Ct. 1575, 1580-81, 91 L.Ed. 1995 (1947). In this case, there was ample warrant for the Commission's procedural decisions. First, the Commission stated that a concrete, demonstrated U.S. commitment to DBS would bolster United States' claims for adequate DBS frequencies and orbital slots at RARC-83. Second, given the long lead time necessary for satellite construction and launch, procedural delay might have frustrated realization of the "substantial public interest in expeditious development of direct broadcast satellite technology" that has already been recognized by this court. See Order, NAB v. FCC, No. 82-1926 (D.C.Cir. Feb. 10, 1983) (denying stay). The Commission's decision to conduct concurrent evaluations of interim rules and applications for experimental service reasonably accommodated these goals with the public's right to participate on the issues presented by DBS. Moreover, we have not been convinced that the Commission's procedures denied any interested party a full and fair opportunity to be heard. We therefore hold that, however rushed the Commission's judgment may have been, there was no procedural error.
 
 CONCLUSION
 
 118
 When technology as novel as DBS confronts a statute as broadly drafted as the Communications Act of 1934, the administering agency has substantial leeway in its efforts to harmonize the two. We conclude that, on the whole, the Commission has exercised this leeway in a reasonable manner. We therefore vacate only that portion of the DBS Order that makes broadcast restrictions inapplicable to some DBS systems and, with the caveats noted above, affirm the rest of that Order. We also affirm in its entirety the STC Decision.
 
 
 119
 It is so ordered.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit sitting by designation pursuant to 28 U.S.C. Sec. 291(a)