740 F.2d 1177
 239 U.S.App.D.C. 74
 UNITED STATES SATELLITE BROADCASTING COMPANY, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GTE Satellite Corporation, National Citizens Committee for
Broadcasting/Telecommunications Research and Action Center,
et al., United Satellite Communications, Inc., Satellite
Business Systems, General Instrument Corporation, Prudential
Insurance Company of America, Intervenors.
UNITED STATES SATELLITE BROADCASTING COMPANY, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
National Citizens Committee for
Broadcasting/Telecommunications Research and Action Center,
et al., United Satellite Communications, Inc., General
Instrument Corporation, Satellite Business Systems,
Prudential Insurance Company of America, GTE Satellite
Corporation, Intervenors.
UNITED STATES SATELLITE BROADCASTING COMPANY, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GTE Satellite Corporation, GTE Spacenet Corporation, RCA
American Communications, Inc., General Instrument
Corporation, Satellite Syndicated Systems, Inc., United
Satellite Communications, Inc., Prudential Insurance Company
of America, Intervenors.
 Nos. 83-1692, 83-1693 and 83-1834.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 23, 1984.
Decided July 24, 1984.
As Amended Oct. 30, 1984.
 
 Petition for Review of an Order of the Federal Communications commission.
 Appeal from an Order of the Federal Communications Commission.
 Petition for Review of an Order of the Federal Communications Commission.
 Marvin Rosenberg, Washington, D.C., with whom James G. Ennis and Thomas J. Dougherty, Jr., Washington, D.C., were on the brief, for petitioner/ appellant.
 Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., John J. Powers, III and Frederic Freilicher, Attys. U.S. Dept. of Justice, Washington, D.C., were on the brief, for respondents/appellee. Edward T. Hand and Robert B. Nicholson, Attys., U.S. Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Jack N. Goodman, Washington, D.C., with whom Dean Burch and James M. Smith, Washington, D.C., were on the brief, for intervenor United Satellite Communications, Inc. Philip L. Verveer, Washington, D.C., also entered an appearance for intervenor United Satellite Communications, Inc.
 
 
 2
 C.W. Quincy Rodgers and Philip L. Verveer, Washington, D.C., entered appearances for intervenor General Instrument Corp.
 
 
 3
 Robert F. Corazzini and Peter H. Feinberg, Washington, D.C., entered appearances for intervenor Satellite Syndicated Systems, Inc. in No. 83-1834.
 
 
 4
 Paul L. Friedman and Carolyn B. Lamm, Washington, D.C., entered appearances for intervenor Prudential Insurance Company of America.
 
 
 5
 F. Thomas Tuttle, Washington, D.C., entered an appearance for intervenor Satellite Business Systems in Nos. 83-1692 and 83-1693.
 
 
 6
 Wilhelmina Reuben Cooke, Washington, D.C., entered an appearance for intervenors National Citizens Committee for Broadcasting Telecommunications Research and Action Center, et al., in Nos. 83-1692 and 83-1693.
 
 
 7
 Before TAMM, MIKVA, and DAVIS,* Circuit Judges.
 
 
 8
 Opinion for the court filed by Circuit Judge DAVIS.
 
 DAVIS, Circuit Judge:
 
 9
 Petitioner-appellant, United States Satellite Broadcasting Co., Inc. (USSB), seeks review of three related decisions by the Federal Communications Commission (FCC or Commission). In No. 83-1692, USSB challenges the FCC's denial of USSB's Petition for Reconsideration of an earlier order granting GTE Satellite Corporation's (GSAT's) application to lease transponders[1] on a Canadian communications satellite, Anik-C2. The transponders were to be used by GSAT's customer, United States Satellite Communications, Inc. (USCI) (formerly United States Satellite Television (USTV)) to receive television signals and retransmit them back to earth in the 11.7-12.2 GHz band. In No. 83-1693, USSB appeals the FCC's grant of authority to GSAT to construct and operate a telemetry, tracking, and command earth station at Terre Haute, Indiana, for the purpose of controlling the Anik-C satellite. In No. 83-1834, USSB seeks review of the FCC's adoption of a rule permitting broadcast satellite television service in the 11.7-12.2 GHz band which had previously been reserved for fixed (point-to-point) satellite service. GSAT and USCI have intervened in support of the FCC. We affirm the FCC's action in all three cases, except for that aspect of its opinion on reconsideration of GSAT's grant which indicates that USCI's proposed satellite-to-home television service is a "fixed satellite service" rather than a "broadcasting satellite service." In light of our holding in the companion case, National Association of Broadcasters, et al. v. FCC, 740 F.2d 1190 (D.C.Cir. decided today), that the statutory definition of broadcasting should be applied as written, we reverse the FCC's denial of USSB's Petition for Reconsideration on that one issue and remand so that the FCC may determine whether GSAT or USCI should bear the burden of ensuring that statutory broadcasting obligations are fulfilled on USCI's satellite-to-home television channels.
 
 
 10
 * BACKGROUND
 
 
 11
 USSB is one of the eight companies which the FCC has authorized to construct and operate a high-powered direct-to-home satellite television system in the 12.2-12.7 GHz band. That system will involve earth stations beaming up television signals to satellite transponders (the "uplink") which will then retransmit the signals back to earth (in the 12.2-12.7 GHz band) (the "downlink") where they will be received by American residents using small dish-shaped antennas. The FCC calls this service the "Direct Broadcast Satellite Service" or "DBS." USSB's DBS service will compete once it becomes operational with the lower-powered satellite-to-home video service which GSAT's customer, USCI, plans to offer in the 11.2-11.7 GHz (described infra ).
 
 
 12
 In February 1982, GSAT filed with the Commission an application for authority under Section 214 of the Communications Act of 1934 (47 U.S.C. Sec. 214)[2] to lease and utilize ten transponders on a Canadian Anik-C satellite, scheduled to be launched later that year and to become operational in mid-January 1983. Application of GTE Satellite Corporation, Feb. 17, 1982. The purpose of the lease, as stated by GSAT in its application, was "to provide interim facilities necessary for GSAT to meet customer demand prior to the launch of GSAT's own ... satellite system in 1984."[3] According to GSAT, the leased transponders would "retransmit ... signals to and from earth stations owned by GSAT's customers within the [northern and central] contiguous United States." GSAT said that the transponders "operate in the Ku (12-14 GHz) band" and that the type of communication signals which the transponders would retransmit "may include television, voice, data and facsimile." GSAT stated that it had "received firm customer commitments for service on each of the proposed RF (radio or radar frequency) channels" from customers who had "placed reservations for similar ... services on GSAT's authorized independent GSTAR system" when it became operational in 1984. GSAT also said that it did "not now provide services of the type to be provided by [the Canadian transponders] although other U.S. carriers ... [did] and additional domestic services of this type have been authorized by the Commission." GSAT's application did not identify its customers or the precise nature of its customers' proposed service(s).
 
 
 13
 The GSAT application appeared in a FCC public notice titled Common Carrier Domestic Facilities Applications and dated March 3, 1982:
 
 
 14
 Conus [contiguous United States] ... GTE Satellite Corp. (GSAT) FORMAL (Section 63.01) Applicant requests authority to acquire by lease and operate a satellite transponder capacity of 54 Mb/s on each of 10 unprotected preemptible transponders on ANIK C satellite of Telesat Canada (Telesat) which is to be launched in late 1982 and become operational in mid-January 1983. Telesat will submit appropriate request to the Canadian Dept. of Communications for authority to enter into the lease agreement with GSAT. Canadian satellite capacity is requested because of the unavailability of U.S. domestic satellite capacity. The use of the facility will be to provide communications services into areas not now directly served by GSAT. Communications to be provided may include television, voice, data and fascimile. The subject transponder capacity is to provide interim facilities necessary to meet customer demand prior to the launch and operation of GSAT's own GSTAR satellite system in 1984.
 
 
 15
 The notice stated that comments or petitions could be filed by April 3, 1982, within thirty days of the date of the notice. USSB did not file a petition to deny GSAT's application, nor did any other entity.
 
 
 16
 In June 1982, GSAT amended its application to notify the Commission of a postponement of the scheduled date of commencement of its service. GSAT characterized this change as "not major" and said that it did not require another public notice to be issued. In that amendment, GSAT disclosed that it had signed an agreement to lease capacity to United Satellite Television (USTV)[4] which planned to provide television programming to "small CATV [cable-TV] systems, hotels, motels, hospitals, low power TV and STV [subscription television or "pay TV"][5] and MDS [multipoint distribution service] operations as well as multiple and single dwellings." According to a letter from USTV (now USCI), submitted by GSAT with its amendment, USTV planned to use frequencies in the 11.7-12.2 GHz band.[6] GSAT requested expedited consideration of its application because of the financial difficulties faced by its customer, USTV. USTV's letter repeated this request, saying that continued delay would threaten the viability of USTV's plans.
 
 
 17
 The Commission granted the GSAT application in August 1982. GTE Satellite Corporation, 90 F.C.C.2d 1009 (1982). In its opinion, the Commission addressed the issue of whether the grant of the authority to GSAT to provide USTV with the means to furnish TV service to single unit dwellings was inconsistent with its regulations concerning DBS and its earlier proposal to the 1979 World Administrative Radio Conference (WARC-79) to allocate separate frequency bands to the Fixed Satellite Services (FSS) and the Broadcast Satellite Services (BSS) and decided that there was no inconsistency:
 
 
 18
 The United States' position at WARC was premised on several factors. Among those was the belief that high quality direct broadcast satellite services would require satellites operating at significantly higher powers than existing and proposed fixed satellite systems. Additionally, the potential inter-leaving of such satellites of disparate power sharing the same frequency bands would have a detrimental impact on the Commission's ability to make necessary changes in the spacing of evolving communications satellite systems. The Commission's recent decision to adopt interim rules for DBS services in the band 12.2-12.7 GHz also was premised on these concerns. Although the WARC adopted the United States' position, it did give recognition to continued sharing by adopting Radio Regulation 836 which provides that the band 11.7-12.1 GHz which is allocated for fixed satellite services be used additionally for broadcasting satellite services but only at restricted power (at no more than 53 dBW per television channel) and without causing greater interference or requiring more protection from interference than the coordinated fixed-satellite service frequency assignments. In view of the fact that the GSAT application proposes to provide USTV with relatively low power service for use in providing video distribution, we find no inherent inconsistency between grant of the application and the Final Acts of the WARC or with our recently adopted interim DBS rules. We intend that the Notice of Proposed Rule Making looking toward implementation of the Final Acts of WARC-79, which we plan to issue in the near future, will address this issue.
 
 
 19
 Id. at p 3 n. 5.
 
 
 20
 On September 2, 1982, USSB petitioned the FCC to reconsider its grant of GSAT's application. USSB requested that the Commission rescind its grant of GSAT's application or, in the alternative, condition GSAT's grant by prohibiting it from offering television service intended for individual reception by the general public. USSB alleged that (1) the Commission's grant of authority was made without benefit of public comment from interested parties because the public notice failed to describe adequately the nature of GSAT's/USTV's proposed services; (2) that GSAT's application was in fact an "errant DBS application" and should not therefore have been considered by the Commission at all since it was filed after the July 16, 1981 cut-off date established in the Commission's DBS proceeding; and (3) that neither GSAT nor the FCC had satisfied the requirements of Section 214 of the Communications Act in that GSAT had not demonstrated the adequacy of its proposed DBS service and the FCC had not found that grant of the application would serve the public convenience or necessity since it did not know the true use for which the facilities would be employed.
 
 
 21
 USSB said that it had not objected to the GSAT application at an earlier date because no public notice was given of the "true" nature of GSAT's proposal due to GSAT's failure to reveal the "DBS proposals" of its customers, USTV, until June 18, 1982, after the April 2 deadline for filing formal objections.
 
 
 22
 Sometime after the FCC issued its order granting GSAT's application, GSAT apparently filed another application (which is not in the record) with the FCC for authority (under Sec. 301 of the Communications Act of 1934) to construct and operate a telemetry, tracking, and command (TT & C) earth station to control the Anik-C2 satellite. USSB filed a motion to deny GSAT's TT & C application. Later, after the pleading cycle had ended for the reconsideration petition on the August 1982 grant, GSAT submitted a letter informing the Commission that USTV would only need four or five transponders (rather than ten) for its initial service. The GSAT letter was placed on public notice so that interested parties could respond. FCC Public Notice, Mimeo 8807 (Jan. 14, 1983).
 
 
 23
 The FCC dealt with USSB's petition for reconsideration and GSAT's TT & C application in one opinion. GTE Satellite Corp., FCC 83-271, slip op. (released June 23, 1983) (GSAT Reconsideration ). With regard to USSB's petition for reconsideration, the FCC rejected all of USSB's contentions, deciding that GSAT's proposal was not for a DBS service, that the public notice of GSAT's application was adequate, and that the grant of GSAT's initial application was in the public interest. USSB's petition to deny the application to construct and operate the TT & C station was also denied. GSAT's Section 214 authorization, however, was modified by the FCC to reflect the reduction in need from ten transponders to five.
 
 
 24
 On December 30, 1982, the FCC issued a Notice of Proposed Rulemaking, proposing, inter alia, the adoption of Footnote 836 of the Final Acts of the 1979 World Administrative Radio Conference (WARC-79) which permits the use of the 11.7-12.2 GHz band for broadcast satellite services.[7] Notice of Proposed Rulemaking, FCC 82-508, slip op. (released Dec. 30, 1982) (Gen. Docket No. 80-739). In that Notice, the Commission said:
 
 
 25
 We recently noted that questions could be raised as to the consistency of certain video services provided over domestic fixed-satellites at 11.7-12.2 GHz and the direct broadcasting service at 12.2-12.7 GHz. See GTE Satellite Corp.....
 
 
 26
 Id. at p 102. Subsequently, the FCC adopted Footnote 836. First Report and Order (WARC-79 Implementation), 54 Rad.Reg.2d (P & F) 101 (1983).
 
 II
 GSAT'S ALLEGED MISREPRESENTATION
 
 27
 In challenging the grants to GSAT, USSB contends that GSAT's initial application misrepresented the nature of the services its customer intended to provide because it did not explicitly state that one service would be a direct-to-home video service. USSB also contends that the FCC acted arbitrarily and capriciously and abused its discretion in not considering this issue, or, alternatively, in not finding that USSB established a prima facie case of misrepresentation by GSAT which mandated a hearing on that issue. As a reviewing court, we cannot, of course, decide the issue of actual misrepresentation de novo; we hold, however, that the FCC did consider this issue and that its failure to order a hearing on the matter was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
 
 
 28
 First, we read the FCC's opinion on reconsideration as squarely dealing with the USSB's allegation of misrepresentation. The FCC acknowledged that "GSAT's failure to volunteer more specific information at the outset ... caused much confusion about its plans...." GSAT Reconsideration, at p 38. It went on to list the reasons GSAT offered for not being more specific in its initial application--"GSAT's desire not to disclose prematurely USTV's marketing plans and the fact that additional information about a customer's precise use of common carrier facilities generally is not disclosed in a facilities application"--and to note that details of the GSAT/USTV proposal were later provided to the Commission and placed in the public file. Id. This is more than sufficient to show that the FCC assessed USSB's misrepresentation claim.
 
 
 29
 Moreover, we cannot hold that the FCC abused its discretion in not ordering a hearing on GSAT's alleged misrepresentation, in view of the fact that GSAT's initial application complied with the literal terms of the applicable regulations, that GSAT's subsequent amendment to its application included a description of USTV's planned direct-to-home video service, and that the FCC is not obligated to consider an applicant's "character" in the context of a Section 214 grant.
 
 
 30
 Section 214(a) of the Communications Act of 1934 requires that a common carrier which seeks to construct, acquire, operate, or extend any communications line must apply to the Commission for a certificate stating that "the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation of such additional or extended line." 47 U.S.C. Sec. 214(a). Commission rules, promulgated pursuant to Section 214(a) (unchanged since GSAT filed its application), require that an application for a certificate of public convenience and necessity include, inter alia, the following information regarding the planned service:
 
 
 31
 (e) A statement as to ... the nature and classification of the communication services to be provided (e.g., telephone, telegraph, facsimile, data, private line, voice, television relay, etc.);
 
 
 32
 * * *
 
 
 33
 * * *(n) Description of the manner and means by which interstate and foreign communication services of a similar character are now being rendered by the applicant and others in the area to be served by the proposed facilities, including reasons why existing facilities are inadequate.
 
 
 34
 47 C.F.R. 63.01(e) and (n).
 
 
 35
 GSAT's application fulfilled these requirements. It stated:
 
 
 36
 (e) The transponder capacity requested by this Application will be used to extend RF [radio frequency] channel communications services into areas not now directly served by GSAT. The requested transponders will function as wideband RF repeaters, retransmitting signals to and from earth stations owned by GSAT's customers within the contiguous United States (CONUS). Communications transiting these facilities may include television, voice, data, and facsimile.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 (n) GSAT does not now provide services of the type to be provided by the herein requested facilities, although other U.S. carriers do so and additional domestic services of this type have been authorized by the Commission.*
 
 
 40
 Application of GTE Satellite Corporation, Feb. 17, 1982, at 3, 8 (emphasis added).
 
 
 41
 Despite GSAT's literal compliance with the disclosure requirements of 47 C.F.R. Sec. 63.01(e) and (n), USSB urges that GSAT's application was nonetheless misleading because it gave a false impression that all its television services would be the traditional point-to-point (rather than a satellite-to-home) service.[8] The thrust of USSB's argument is not precisely clear, but our understanding is that USSB takes the following positions: (1) GSAT's alleged misrepresentation (as it was incorporated in the public notice) gave the communications industry an inaccurate view of GSAT's customer's plans; (2) GSAT's alleged misrepresentation caused the FCC to grant its application based on a false perception of GSAT's customer's plans; and (3) GSAT's alleged misrepresentation demonstrates its "bad character" and unsuitability for the FCC grant.
 
 
 42
 USSB's first argument, that GSAT's alleged misrepresentation, which was incorporated in the public notice issued by the FCC, misled USSB and others regarding USTV's "true" plans, is essentially identical to USSB's separate claim that the public notice of GSAT's application was inadequate. That claim is addressed, infra, in Part III.
 
 
 43
 We are not persuaded by USSB's argument that GSAT's application must be deemed misleading vis-a-vis the FCC. Even assuming that GSAT's initial application was unclear standing alone, when it is considered together with GSAT's later amendment (which was filed before the Commission decision on GSAT's request for permission to lease the transponder space), the complete application fully disclosed the direct-to-home television aspect of USTV's planned service in time for the FCC to make an informed decision on the application. The FCC's opinion makes clear that it was entirely aware of the nature and significance of the proposed "television" service and that it had not been misled in any way:
 
 
 44
 GSAT's customer for its service is United Satellite Television (USTV) who proposes to distribute video programming to small receiving antennas in the 11.7-12.2 GHz band. According to USTV, customers include small cable television systems, hotels, motels, hospitals, low power TV stations, STV and MDS stations and multiple and single unit dwellings.
 
 
 45
 90 F.C.C.2d 1009, 1010 (emphasis added).
 
 
 46
 Later in its opinion, the FCC explicitly addressed the question of the consistency of its action in granting GSAT's application (in light of USTV's plan to provide video service to "single unit dwellings") with its recently adopted interim rules for Direct Broadcast Service and with its WARC-79 proposal that separate frequency bands should be allocated to the fixed satellite and broadcast satellite services. It concluded that there was "no inherent inconsistency" between the grant of GSAT's application and its earlier actions, since the assumptions upon which the prior acts had been premised were no longer valid. Id. at 1011 n. 5. Nowhere in the opinion is there any evidence that the FCC made false assumptions on the basis of GSAT's initial description of USTV's planned services.
 
 
 47
 We also reject as inapplicable the argument USSB impliedly makes (as we interpret it) that GSAT's alleged misrepresentation demonstrates bad character and makes it an unsuitable recipient for the FCC grant. It is true that character is a qualification for a broadcast license under Section 308(b) of the Communications Act and misrepresentations by a broadcaster to the Commission may be grounds for denial of or failure to renew a broadcast license. See, e.g., Lebanon Valley Radio, Inc. v. FCC, 503 F.2d 196, 200 (D.C.Cir.1974); Brandywine-Maine Line Radio v. FCC, 473 F.2d 16, 52 (D.C.Cir.1972); Immaculate Conception Church of Los Angeles v. FCC, 320 F.2d 795 (D.C.Cir.), cert. denied, 375 U.S. 904, 84 S.Ct. 196, 11 L.Ed.2d 145 (1963). We have just held that the FCC could properly hold that GSAT made no misrepresentations. There is, moreover, no comparable requirement that the FCC consider the character of applicants under Section 214, the section under which GSAT applied for its grant. Broadcasters are "public trustees," common carriers are not. See Brandywine-Main Line Radio, Inc., supra, at 61. GSAT's only obligation was to furnish the FCC with the information requested in 47 C.F.R. Sec. 63.01, which it did.
 
 
 48
 Finally, we mention briefly that we agree with the Commission that GSAT's application for authority to lease transponder space was not an "errant DBS application," although USSB did not raise this issue before us as it did before the FCC. To the extent that GSAT made representations about its customer's plans in its application, the differences in power and frequency between USTV's proposed "television" service and DBS and the implications of those differences (orbital spacing, antenna size) are sufficiently significant to overcome any claim that GSAT failed to identify USTV's "television" service by its "true name," DBS.[9]
 
 III
 ALLEGED LACK OF ADEQUATE NOTICE
 
 49
 Another of USSB's claims, mentioned supra, is its charge that the public notice of GSAT's application (as a result of GSAT's failure to accurately disclose USTV's "true" plans) was insufficient to give interested persons an opportunity to comment on the direct-to-home aspect of USTV's service. USSB also says that its subsequent opportunity to comment prior to the FCC's reconsideration decision could not cure the original defect.
 
 
 50
 We note at the outset that neither the Communications Act nor the Commission's rules prescribe the contents of a public notice of a Section 214 application.[10] In our view, the public notice sufficiently described the common carrier service GSAT intended to provide. GSAT was applying for authority only to lease and operate transponder capacity. The public notice adequately described that proposal. As pointed out by the FCC, it "indicated the number of channels to be leased, the area within which service is to be provided, and the satellite on which the channels were to be leased." GSAT Reconsideration, at p 37 (see Part I, supra, for reproduction of public notice). The notice also indicated that the lessees or others using the service could include entities employing "television." Although we agree with USSB that the public is entitled to notice of USTV's (now USCI's) innovative plan to provide satellite-to-home video programming, that information need not be included in the public notice of GSAT's request for transponder space. Insofar as USSB wished to know about USTV's plan in order to comment on GSAT's application, that opportunity was fully available to it after the Commission's actual decision and was fully availed of. Because the only application before the FCC was GSAT's common carrier application--not USCI's proposal for its own operations--we think that this opportunity was sufficient. The FCC's reconsideration decision paid attention to USSB's comments and took them into account; we cannot consider the reconsideration to have been a sham.[11]
 
 IV
 
 51
 GSAT/USCI AS "BROADCASTERS""
 
 
 52
 We disagree with the FCC's conclusion in GSAT Reconsideration that USCI's direct-to-home video service is not "broadcasting." In the companion case to this one, NAB v. FCC, 740 F.2d 1190, supra, decided today (D.C.Cir.), we stress the Communications Act's definition of "broadcasting": "the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." 47 U.S.C. Sec. 153(o ). as we note in Nab v. FCC, this court has previously held that the test for whether a particular activity constitutes broadcasting is whether there is "an intent for public distribution" and whether the programming is "of interest to the general ... audience." Functional Music, Inc. v. FCC, 274 F.2d 543, 548 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959) (emphasis added).
 
 
 53
 USCI's proposal to provide advertiser-supported television service to the public via the transponders on the Canadian satellite falls squarely within the statutory definition of broadcasting. As for USCI's proposed subscription service, although USCI will "know" its pay-TV customers, this service is also "a dissemination of communications to the public" and must also be classified as "broadcasting." As the FCC observed several years ago in the context of its subscription television proceedings, "broadcasting remains broadcasting even though a segment of the public is unable to view programs without special equipment." Subscription Television Service, 3 F.C.C.2d 1, 10 (1966). In that opinion, the FCC also said:
 
 
 54
 The evident intention of any station transmitting subscription programs would be to make them available to all members of the public within range of the station.... It would appear that the primary touchstone of a broadcast service is the intent of the broadcaster to provide radio or television program service without discrimination to as many members of the general public as can be interested in the particular program as distinguished from a point-to-point message service to specified individuals....
 
 
 55
 Id. at 9. Likewise, USCI's subscription service is "broadcasting" because it is intended for reception by any member of the public within the area of service who purchases the service. See NAB v. FCC, supra.
 
 
 56
 We therefore reverse that aspect of the FCC's GSAT Reconsideration decision which decides that USCI's video-to-home service is not broadcasting and remand the case to the FCC so that the Commission may determine which of USCI or GSAT should be responsible for ensuring that the statutory broadcasting obligations are fulfilled. See NAB v. FCC.[12]
 
 V
 WARC-79 IMPLEMENTATION
 
 57
 In its First Report and Order (WARC-79 Implementation), 54 Rad.Reg.2d (P & F) 101 (June 1983), the FCC (1) incorporated into its Table of Allocations a provision (that had been agreed upon at the 1979 World Administrative Radio Conference) permitting broadcast satellite operations to share the same spectrum with fixed satellite service and (2) eliminated (in effect) Section 2.106, footnote NG105's provision that use of the 11.7-12.2 GHz band for BSS was to be postponed pending the adoption of appropriate rules. See supra note 6. We uphold this action as a valid exercise of the FCC's rulemaking powers against USSB's contention that the rulemaking violated the Administrative Procedure Act and the Communications Act of 1934.
 
 
 58
 When reviewing a rulemaking proceeding by the FCC, the court's task is to determine whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); ITT World Communications, Inc. v. FCC, 725 F.2d 732, 741 (D.C.Cir.1984). In this case, USSB charges the FCC with failure to take the required "hard look" at the public interest considerations before adopting the new rule and to address significant comments submitted by USSB and another party, Satellite Television Corporation (STC). USSB also claims that the FCC's alleged failure to consider its comments and those of STC amounts to a violation by the FCC of the Communications Act of 1934, since it did not consider factors relevant to the public interest, as that Act requires.
 
 
 59
 It should be borne in mind that the FCC has the responsibility to reevaluate its regulations over time and to alter them in light of developments in the evolving communications industry. Office of Communication of the United Church of Christ v. FCC, 707 F.2d 1413, 1425 (D.C.Cir.1983). In prior cases, we have held that the FCC has the right to modify or overrule its own longstanding practices provided that it supplies a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." Id. at 1425-26 (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971)); National Citizens Committee for Broadcasting v. FCC, 567 F.2d 1095, 1099 (D.C.Cir.1977). The Commission clearly complied with this requirement in this case.
 
 
 60
 In its opinion, the FCC explained that its new rule was a response to and recognition of technological advances enabling medium-powered satellites to provide video services directly to the public. It said:
 
 
 61
 [T]echnology has changed substantially since the U.S. positions for the 1979 WARC were formulated .... In particular, the assumption that led to the allocation of separate bands to the FSS and BSS at the 1979 WARC was based upon the large power difference between the high-powered BSS and the low-powered FSS satellites .... Such large power differences would have resulted in a requirement for excessive orbit spacings and other sharing problems if both services were provided in the same band. For these reasons, as well as regulatory provisions governing the use of the 11.7-12.2 GHz band by both FSS and BSS in Region 2, we successfully advocated separate allocations for the two services. However, because of technical advances, domestic FSS systems in this band are now able to use medium-powered FSS satellites with ... [higher power] than the early domestic FSS satellites.... Further, the powers proposed for BSS operations in this band are substantially lower than those proposed for the 12.2-12.7 GHz BSS band. Therefore, these new medium-powered FSS satellites should be able to provide BSS operations as proposed without any adverse impact on orbit spacing in this band.
 
 
 62
 Thus, the FCC straightforwardly identified its change of policy and the underlying rationale.
 
 
 63
 We cannot accept USSB's charge that the FCC failed to address significant comments on the proposed rule. With respect to the argument that the changed rule would result in inefficient use of spectrum space, the FCC acknowledged that this argument was made (WARC-79 Implementation, at p 4) and that the issue had at one time been a matter of concern. It concluded, however, that the assumptions upon which the initial allocation of separate bands to FSS and BSS were based were "out-dated and no longer valid." Because of "technical advances," the Commission said, "new medium-powered FSS satellites should be able to provide BSS operations as proposed without any adverse impact on orbit spacing in this [11.7-12.2 GHz] band." Likewise, the "current state of technology" and the "ability [of satellite operators] to coordinate traffic on adjacent satellites" would keep interference to an acceptable level.
 
 
 64
 In notice and comment rulemaking, an agency need not respond to every comment so long as it responds in a reasoned manner to significant comments received. Action on Smoking and Health v. CAB, 699 F.2d 1209, 1216 (D.C.1983); Alabama Power Co. v. Costle, 606 F.2d 1068, 1086 (D.C.Cir.1979). The FCC may not have explicitly discussed each and every contention made by USSB and STC on the subject of spectrum management,[13] but in light of the fact that the opinion was centered on that issue, and that the FCC did acknowledge that USSB and STC had argued that the changed rule was poor spectrum management, we read the opinion as clear implicit rejection of USSB's and STC's various specific comments on the subject.
 
 
 65
 We also hold that the Commission considered and rejected USSB's contention that lower-powered direct-to-home satellite service will be inimical to the best interests of the consumer because it will threaten the viability of DBS service (by fragmenting the consumer market between 11.7-12.2 GHz band and 12.2-12.7 GHz band (DBS)) and deprive consumers of the opportunity to receive many different satellite television channels (because low-cost antennas will be oriented to receive the signals of only one satellite). The Commission acknowledged that USSB and STC had argued that "the consumer ... would lose [by the new rule] because he would not be able to view all available DBS programming with one set of receiving equipment." WARC-79 Implementation, at p 4. Its later response to that argument was that it "believe[d] that allowing BSS operations in this band ... [would] be in the best interest of the general public by enhancing the opportunities for the market place to develop BSS to the extent technically possible." Id. at p 9. Moreover, in the GSAT Reconsideration order, which was adopted on the same date as the WARC-79 Implementation order and referred to that order (GSAT Reconsideration, at p 34), the Commission said:
 
 
 66
 [T]echnological advances which allow domestic fixed satellites to deliver television programs to homes, albeit at lower quality and/or with less reliability than true DBS systems should not be excluded because of their lower quality. In these circumstances, we are reluctant to substitute our judgment for that of market place forces to determine price, range of service, and quality of service that customers will expect.
 
 
 67
 Id. at p 41 n. 35. In the same vein, Commissioner Dawson said, in her separate statement appended to the Commission's opinion:
 
 
 68
 [T]he consumer benefits when satellite facilities are utilized to the maximum extent possible. To ensure these benefits, service providers leasing satellite capacity must be free to use those facilities in innovative and productive ways.... From a public interest standpoint, USCI's proposal [or a similar proposal] offers a new manner of video distribution adding variety and a corresponding boost in consumer choice.
 
 
 69
 This gain to consumers would be frustrated by prohibiting USCI's [or another entity's] use of fixed satellites to provide home video service in potential competition with DBS. Since the inception of domestic satellite service, this Commission's policies have been directed towards maximizing entry and maintaining a flexible regulatory approach for the very purpose of promoting competitive and innovative service offerings. [Footnote omitted.] Limiting the use of fixed satellites would needlessly thwart this goal with no corresponding benefits to the public ... the public will ... decide which of these service providers will survive--those utilizing existing lower powered satellites or those utilizing high powered DBS satellites....
 
 
 70
 We hold these excerpts to be a reflection of the FCC's considered view that the potential technical problems with a USCI-type video service and the competitive threat it poses to DBS are outweighed by the public benefit of an increased number of video service choices which results from encouraging innovative satellite technology.
 
 
 71
 For these reasons, we cannot agree that the FCC failed to take a "hard look" at the considerations involved in permitting broadcasting operations in the 11.7-12.2 GHz band. USSB argues that certain facts are "suggestive"--the fact that the FCC in its Notice of Proposed Rulemaking, FCC 82-508, slip op., at p 102 (released December 30, 1982) referred to "questions [which] could be raised" by the GSAT decision, the fact that the new rule was adopted the same day that the FCC denied USSB's petition for reconsideration of the GSAT grant, and the fact that the Commission considered this issue first and separately from the rest of the massive WARC-79 proceeding.[14] If these facts are "suggestive" of anything it is that the Commission took an unusually hard look at the issue, rather than the contrary. GSAT's application first raised for the FCC the issue of BSS service in the 11.7-12.2 GHz band; it did not (as USSB alleges) create a need for the Commission to "legitimize" its decision in that case in a later rulemaking.
 
 
 72
 Finally, USSB argues that the FCC violated its obligation under Section 303 of the Communications Act of 1934 to promulgate rules only as "the public convenience, interest, or necessity requires ..." because it failed to consider all the issues raised by the commenting parties. We have held, supra, that the FCC considered the issues of spectrum management and consumer welfare raised by USSB and STC and fully discussed the rationale for its change of position. USSB's further charge that "nowhere in the WARC-79 Decision [Implementation] oes the FCC conclude that the public interest favors the adoption of rules permitting satellite television in the 11.7-12.2 GHz band ..." is incorrect. We call to USSB's attention the sentence quoted, supra, from the FCC's opinion: "[W]e believe that allowing BSS operations in this band will be in the best interest of the general public by enhancing the opportunities for the market place to develop BSS to the extent technically possible." WARC-79 Implementation, at p 9 (emphasis added). In sum, USSB has failed to show that the FCC's rulemaking violated the Communications Act.
 
 VI
 
 73
 For the foregoing reasons, we affirm those parts of the FCC's GSAT Reconsideration decision that grant GSAT's application for authority to lease transponder space on the Anik-C2 satellite and to construct a telemetry, tracking, and command earth station. We reverse the FCC's decision to the extent that it holds that USCI will not be providing broadcasting service and remand to the FCC so that it may determine which of USCI or GSAT should be responsible for complying with the Communications Act's restrictions on broadcasters. We affirm the FCC's WARC-79 Implementation decision to the extent that it adopts a new rule permitting broadcast satellite television service in the 11.7-12.2 GHz band.
 
 
 74
 Affirmed in part, reversed in part, and remanded.
 
 
 
 *
 Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to Title 28 U.S.C. Sec. 291(a)
 
 
 [1]
 A transponder is "a radio or radar transceiver [a transmitter and receiver combined in one unit] ... that automatically transmits ... [the signals it receives] promptly on reception...." Random House Dictionary of the English Language (1967)
 
 
 [2]
 Section 214 provides:
 (a) No carrier shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line....
 
 
 [3]
 In 1981, the FCC authorized GSAT to construct and operate its own domestic satellite system to provide fixed satellite service in the 11.7-12.2 GHz band. GTE Satellite Corp., 84 F.C.C.2d 562 (1981)
 
 
 [4]
 USCI is the corporate successor to USTV
 
 
 [5]
 Typically, a subscription station broadcasts a "scrambled" signal that can be converted to intelligible form by special equipment owned or leased by subscribers
 
 
 [6]
 Between 1973 and 1983 (when the FCC adopted a new rule, see Part V, supra ) the FCC permitted only Fixed Satellite Services (FSS) to be authorized in the 11.7-12.2 GHz band, although the band was allocated for use by both FSS and Broadcast Satellite Service (BSS). Footnote NG105 of Section 2.106 of the FCC's Table of Frequency Allocations provided, in part:
 
 
 NG105
 pending adoption of specific rules concerning sharing of the band 11.7-12.2 GHz between the Broadcasting-Satellite and Fixed-Satellite Services, systems in the latter service may be authorized on a case by case basis
 Frequency Allocations, 43 F.C.C.2d 862, 863 (1973) (emphasis added). The FCC's rules define FSS as:
 
 
 A
 radio communication service:
 (a) Between earth stations at specified fixed points when one or more satellites are used; in some cases this service includes satellite to satellite links, which may also be effected in the inter-satellite service;
 (b) For connection between one or more earth stations at specified fixed points and satellites used for a service other than the fixed-satellite service (for example, the mobile satellite service, broadcasting-satellite service, etc.).
 
 
 [47]
 C.F.R. Sec. 2.1 (1982). USSB says in its brief that the "fixed satellite service has traditionally been used as a means of distributing programming from a central point to retailers such as owners of cable headends, television stations, or hotels and motels, who then market these programs to the ultimate consumers, the public." It argues that USTV's video service to single dwellings is not fixed, but rather broadcast satellite service. See Part IV, infra
 The Broadcasting Satellite Service is defined as:
 A radio communication service in which signals transmitted or retransmitted by space stations are intended for direct reception by the general public.
 Note: In the broadcasting-satellite service, the term 'direct reception' shall encompass both individual reception and community reception.
 
 
 [47]
 C.F.R. Sec. 2.1 (1982). Individual reception is defined:
 The reception of emissions from a space station in the broadcasting-satellite service by simple domestic installations and in particular those possessing small antennas.
 Id.
 
 
 [7]
 The Notice as a whole proposed the adoption of the Final Acts of WARC-79 into Part 2 of the Commission's Rules and Regulations, and the removal of "obsolete and outdated" provisions. Id. at p 1
 
 
 *
 See In the Matter of Orbital Locations, 84 F.C.C.2d 584 (1981)
 
 
 [8]
 USSB cites GSAT's statement that it would provide service "to and from earth stations owned by GSAT's customers" and its representation that other U.S. carriers provide the services which its requested facilities would provide. See Part I, supra
 
 
 [9]
 The differences between the services also justify the FCC's conclusion that they need not be treated in the same proceeding
 
 
 [10]
 The Communications Act merely provides: "Upon receipt of an application [for a Section 214 certificate], the Commission ... may require such published notice as it shall determine." 47 U.S.C. Sec. 214(b). Likewise, the Commission's rules say nothing about the type or form of public notice of a Section 214 application: "No application ... shall be granted by the Commission earlier than 30 days following issuance of public notice by the Commission of the acceptance for filing of such application or any major amendment...." 47 C.F.R. Sec. 63.52(b)
 
 
 [11]
 We can attribute no weight to the purported remark of some FCC staff person, after the Commission had voted to deny reconsideration, that "What did you want us to do? We made a mistake the first time around and we can't admit that."
 
 
 [12]
 Our opinion in NAB v. FCC expresses no preference for regulating programmers rather than their lessors as broadcasters and no view on the legal sufficiency of any particular approach
 
 
 [13]
 USSB and STC alleged (in brief paragraphs in their comments submitted to the Commission) that low power 11.7-12.2 GHz band satellites will concentrate their power in only a portion of the bandwidth assigned to them, wasting the remainder of the spectrum. USSB Reply Comments in General Docket No. 80-739, at 10; STC Comments in General Docket No. 80-739, at 22. They also alleged that permitting a consumer satellite television service in the 11.7-12.2 GHz band would result in loss of flexibility to accommodate new and efficient uses of that band. USSB Comments in General Docket No. 80-739, at 9-10; STC Comments, supra, at 3, 15-16; STC Reply Comments in General Docket No. 80-739, at 5. These are the specific comments on the subject of spectrum management which USSB says the FCC acknowledged but did not discuss
 
 
 [14]
 According to USSB, the WARC-79 proceeding involves a 294-page Notice of Proposed Rulemaking containing proposals to amend the Commission's rules governing the use of different frequencies. The FCC decided to address proposals affecting frequencies other than the 11.7-12.2 GHz band at a later date. WARC-79 Implementation, at p 1